[No. F055097. Fifth Dist. Oct. 28, 2008.]

In re A.A. et al., Persons Coming Under the Juvenile Court Law.
TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
V.P. et al., Defendants and Appellants.

COUNSEL

Caroline Todd, under appointment by the Court of Appeal, for Defendant and Appellant V.P.

Law Offices of Joanne W. Newton and Joanne W. Newton for Defendant and Appellant Tule River Tribe.

Kathleen Bales-Lange, County Counsel, and Amy-Marie Costa, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**WISEMAN, Acting P. J.**—This appeal involves two preschool-age children whom a superior court found adoptable and freed for adoption. (Welf. & Inst. Code, § 366.26.)[1] Reaching this decision proved elusive for approximately 18 months. This was due in part to the fact the children were Indian, and the

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

court proceeded according to the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). Respondent Tulare County Health and Human Services Agency (agency) placed the children with extended family members for the purposes of adoption but, within a matter of months, the relative caregivers asked the agency to remove the children from their care. The agency was able to successfully move the children and place them in an Indian foster home specifically interested in adoption. However, eight months later and on the eve of a new section 366.26 hearing for the children, their former relative caregivers, prompted by the Indian tribe, asked to be reconsidered for adoptive placement. By that point, however, moving the children yet again would have been detrimental because each child suffered from an attachment disorder.

Their mother, who is an enrolled member of the Tule River Tribe (Tribe), and the Tribe appeal from the termination of parental rights on numerous grounds. Joining in one another's briefs, appellants contend there was insufficient evidence to support the court's adoptability and active-efforts findings and that the court erred by either not applying a new statutory exception to termination for Indian children or not ordering the children's change in placement.

California recently revised and recast portions of the code that address Indian child custody proceedings by codifying into state law various provisions of ICWA, the Bureau of Indian Affairs Guidelines for State Courts (U.S. Dept. of Interior, Bur. of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584 (1979) (Guidelines)), and the state's Rules of Court. (Stats. 2006, ch. 838.) Since several of appellants' contentions raise questions of first impression about these recently enacted amendments, we publish our decision. Having reviewed the law and the record in this case, we affirm.

## *PROCEDURAL AND FACTUAL HISTORIES*

In July 2005, when the children in this appeal were one and two years of age, their mother gave birth to a drug-exposed child. Paramedics arrived at the mother's home to find the newborn in the mother's pants with the umbilical cord still attached. Brought to a hospital to separate the baby from the mother, both the mother and the newborn tested positive for methamphetamine. Although the mother knew or reasonably should have known she was pregnant, she continued to use drugs and was unable to provide regular care for the children. (§ 300, subd. (b).) The father was incarcerated, awaiting trial on a murder charge, and could not arrange adequate care for them. (§ 300, subd. (g).)

At an August 2005 detention hearing, the Tulare County Superior Court found that ICWA applied based on the mother's membership in the Tribe. Shortly thereafter, the Tribe's records specialist verified that neither the children nor their newborn sister were enrolled members of the Tribe; however, their mother was an enrolled member. The Tribe's ICWA specialist attended the hearings in this case, commencing at a September 6, 2005, hearing in which the trial court exercised its dependency jurisdiction over the children.

Initially, the social worker assigned to the case was unaware of any available Indian foster homes in the area. Also, relatives whom the agency first considered for placement withdrew their request. Consequently, the agency placed the newborn with one non-Indian foster family qualified to provide for drug-exposed infants and her older sisters, the children here, with another non-Indian foster home. Unfortunately, less than a month after their detention, the children were placed in a second foster home after one of them suffered severe burns in the first foster home. As the dispositional hearing approached, the mother provided two additional names of family members whom she wished the agency to consider for placement. Her first choice was an extended family member whom she believed was a tribal member as well as a foster parent. The agency contacted the relative, who was an enrolled member of the Tribe, and his wife in August 2005, inquiring if they could take all three siblings into the relative's home. Although the couple, Mr. and Mrs. G., were foster parents, they were only licensed to accept two children. The G.'s would need an exemption or a new license to receive all three sisters.[2] It is undisputed on appeal that the other relative whom the mother suggested did not meet placement requirements.

Later in September 2005, the court adjudged the children and their newborn sister juvenile dependents and removed them from parental custody.[3] In the process, the court made two ICWA-related findings that (1) active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful; and (2) the continued parental custody of the children and their newborn sister was likely to result in serious emotional or physical damage to them. (§ 361.7.) Within a matter of days, the agency placed the sibling with the G.'s (relative caregivers). The children meanwhile remained in their non-Indian foster home where they did well and were happy and healthy.

---

[2] The standards used to determine the suitability of a relative placement are the same as those set forth in the regulations for licensing foster family homes. (§§ 309, subd. (d)(1), 361.3, subd. (a)(8).)

[3] Since two of the three sisters share the same initials, we will refer to the two older sisters who are the subject of this appeal as "the children" and their younger sister as "the sibling."

Over the next six months, the mother did not comply with any component of her reunification case plan. It appeared she might still be abusing methamphetamine. She was a "no show" for more than 20 random drug tests. She also canceled or never attended 20 out of 25 scheduled visits with the children. Meanwhile, the father was incarcerated in a unit where no services were available to him and contact visits were not permitted. Under these circumstances, as well as the fact there was no substantial probability that either parent would reunify within another six months and all three sisters were under the age of three when they were removed (§ 361.5, subd. (a)), the agency in a March 2006 status review report recommended the court terminate reunification services and set a section 366.26 hearing to select and implement permanent plans.

The agency in the meantime conducted an adoption assessment for all three sisters, a copy of which it attached to its status review report. It found each was adoptable due to her young age, "minimal to no issues," and the commitment of one caregiver to adopt. The G.'s were committed to adopting the sibling and were willing to consider adopting all three sisters. According to the assessment, consideration was being given to placing the children, who remained in a non-Indian foster home, in the G.'s home depending on space being available.

As the status review hearing approached, the Tribe, through its tribal chairman, wrote the court asking to intervene in the dependency and to recommend that the court return the children to the mother's care and order guardianship, rather than adoption, for the sibling. On the date originally set for the six-month review, the court advised the Tribe's ICWA coordinator it could not accept the Tribe's ex parte documentation and that the Tribe should file a motion to intervene. The court also ordered the agency to provide narratives to all counsel and the Tribe. It then continued the hearing.

The Tribe consequently filed a motion to intervene, in which it also petitioned to invalidate (§ 224, subd. (e)) any orders that were not in compliance with its resolution.[4] The resolution, which was attached to the Tribe's motion, declared that the Tribal Council "traditionally opposed legal adoption of our Native children," recommended guardianship for the sibling, and preferred placing all three sisters with the G.'s, the relative caregiver for the sibling. According to a March 2006 minute order, the court was inclined to grant the motion to intervene, but otherwise would deny all motions without prejudice. No reporter's transcript of this hearing was transcribed and

---

[4] Any Indian child, Indian child's tribe, or parent from whose custody the child has been removed, may petition the court to invalidate an action in an Indian child custody proceeding for foster care placement if the action violated certain procedural and substantial ICWA requirements. (25 U.S.C. §§ 1911, 1912, 1913; Welf. & Inst. Code, § 224, subd. (e).)

filed with the appellate record. It also granted a request by the Tribe's attorney for a short continuance to prepare for the status review hearing. According to the appellate record, the Tribe did not subsequently file a new petition to invalidate.

Eventually, the court conducted its status review in April 2006. Again, a reporter's transcript of the hearing has not been transcribed and filed with the record. On the issue of reunification services, the court found reasonable services had been offered to both parents, and they failed to participate and make substantial progress. In addition, because there was no substantial probability that either parent would reunify within another six months and all three sisters were under the age of three when they were removed (§ 361.5, subd. (a)), the court terminated reunification services. The court also set a section 366.26 hearing to select and implement permanent plans and gave the parents notice of their writ remedy. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.450.)

The minute order for the April 2006 hearing also stated: "As to the Tribe's request to place [the children] in an ICWA (Indian Child Welfare Act) home: The Agency is to follow the law pertaining to ICWA and if a change in placement is required, the Agency is to follow the law. Agency is to advise the court as to the status of placement at the next hearing."

In its report for the section 366.26 hearing scheduled for August 2006, the Agency addressed the status of the children's placement. Their non-Indian foster mother was hospitalized in June 2006 for a brain aneurysm, which created a need to change the children's placement. The agency solicited family names for placement purposes from the relative caregivers for the sibling and from the Tribe's ICWA coordinator. Eight relatives were separately assessed and were found, for different reasons, not to meet licensing requirements. The ICWA coordinator had not provided the agency with the names of any individuals or families who could meet the licensing requirements. As a result, the agency placed the children in another non-Indian foster home until a permanent placement could be identified. Although the department believed the children were adoptable, it requested more time to locate prospective adoptive parents who were relatives or otherwise met ICWA placement preferences.

At the same time, the agency reported the children's sibling was adoptable and identified the G.'s as the sibling's prospective adoptive parents. The agency noted the relative caregivers, who met ICWA placement preferences, were committed to raising the sibling. In urging the court to terminate parental rights for the sibling, the social worker reported termination would not interfere with the child's relationship to her older sisters because she was not raised with them and they had only begun to become acquainted.

Again, the record does not contain a reporter's transcript of the first section 366.26 hearing. According to a minute order for the August 2006 hearing, the court continued the matter in the sibling's case for "an ICWA Affidavit." With respect to the children, the court found termination would not be detrimental, but no adoptive parent had been identified and the children were difficult to place because they were part of a sibling group that should stay together. The court identified adoption as the permanent plan goal and directed the agency to make efforts to locate an appropriate adoptive family. It continued the children's section 366.26 hearing until January 2007.

In the interim, specifically late September 2006, the agency placed the children, along with their sibling, in the home of the G.'s toward a goal of adoption. At some point, these relative caregivers applied with licensing to have all three children placed in their home. When that application was approved, the relative caregivers agreed to have the children move into their home. Meanwhile, the court apparently terminated parental rights as to the sibling and later still granted an adoption petition by the relative caregivers.

Soon after this fourth placement change for the children, the agency requested the children be assessed to determine if they had an attachment disorder. Although the children shared a close relationship, they also fought and scratched one another. A clinical psychologist with Synchrony of Visalia, Inc. (Synchrony), apparently found the children had attachment-disorder issues and developmental delays, particularly in terms of communication. In turn, referrals were made to Central Valley Regional Center for a developmental evaluation and a play therapist. The purpose of play therapy was to help determine why the children fought and to understand the nature of their communication delays. The play therapist would then make referrals for other services as appropriate.

Regrettably, the relative caregivers decided in late November 2006 not to pursue adoption of the children. The agency reported the children's developmental and emotional needs were beyond the relative caregivers' capabilities. Nonetheless, the relative caregivers were committed to providing the children with a home and therapeutic services until a prospective adoptive family could be identified. The relative caregivers were then in the process of adopting the sibling.

The children's social worker believed they might be adoptable again, after services were in place for at least six months and assuming they exhibited progress in terms of speech, language, interpersonal skills, and other developmental tasks. In the meantime, the agency recommended the court select long-term foster care as the permanent plan for the children until a prospective adoptive family could be identified.

Although the continued section 366.26 hearing for the children in January 2007 was reported, no reporter's transcript was transcribed and filed with the appellate record. According to a minute order from the January 2007 hearing, the court found the children were not adoptable "[b]ased on behavioral issues and sibling group factors." The court identified the children's permanent plan as a planned permanent living arrangement with the relative caregivers along with a goal of adoption. The court also granted the Tribe's request to intervene.

Four months later, the agency placed the children in a prospective adoptive home which met ICWA placement preferences. Although the Tribe had been unable to provide the names of eligible tribal families for placement purposes, the agency identified what it described as an ICWA-eligible foster family who wished to adopt the children. As the record would later reveal, one of the foster parents was a registered member of the Cherokee Nation. After transition visits in April, the agency moved the children from the home of their relative caregivers to that of the current caregivers in mid-May 2007.

The current caregivers were aware of and understood the neglect the children had suffered, as well as the multiple placements they endured, both of which contributed to the children's behavioral issues. The agency also reported that the former relative caregivers obtained educational resources for the children, gave them a safe and stable home, and helped them improve their age-appropriate developmental skills, until the new prospective adoptive family could be located. The agency recommended that the court set a new section 366.26 hearing to establish the permanent plan of adoption for the children.

The court in turn followed the agency's recommendation and set a new section 366.26 hearing for the children. Although the mother filed a notice of intent to file a writ petition challenging the setting order, she filed an inadequate petition which this court dismissed. (*Valerie P. v. Superior Court* (Oct. 16, 2007, F053413) [nonpub. opn.].)

In preparation for this third section 366.26 hearing, the agency submitted a written assessment of the children's adoptability as well as a preliminary assessment of their current caregivers' eligibility and commitment to adopt. According to the agency's analysis, the children were likely to be adopted because they were young and, although they still had emotional and behavioral problems, their current caregivers had not wavered from their commitment to raise the children as their own. The agency also mentioned that one of the current caregivers was a registered member of the Cherokee Nation and "meets ICWA eligibility." Further noting the sibling had been adopted by

the relative caregivers, the agency added that both families remained in contact in the interests of maintaining a relationship and their common American Indian ancestry.

In her form "ACKNOWLEDGMENT OF RECEIPT" of notice for the section 366.26 hearing, the mother checked a box indicating she did not agree with the agency's recommendation. Although she also checked a box on the form indicating her interest in being present at the hearing, she was absent for both the evidentiary hearing and the further hearing at which the court announced its decision.

On the November 2007 date set for the section 366.26 hearing, the matter needed to be continued because the father, who by then was incarcerated in state prison, had not been transported for the hearing. Counsel and the Tribe's ICWA coordinator also represented that the former relative caregivers wished to be reconsidered for placement. The court remarked that these relatives should contact the social worker and in turn directed the agency to evaluate the situation as well as submit a followup memo regarding placement for the continued hearing date.

In its December 2007 followup memo, the agency recommended against changing the children's placement once more.

"The reason the [children] were moved was at the request of [Mr. and Mrs. G.]. Several times between 02/2007 and 05/2007, [Mrs. G.] telephoned the Adoptions Team Leader, Kathleen Trevino asking when and how quickly we could locate another home for the [children]. [Mrs. G.] stated that she had changed her mind about adoption of [the children] for the following reasons: she and her family wanted to relocate to South Dakota, they had to attend a wedding and make moving arrangements; they did not want conflict with the [Tribe] because two of her young adult children, enrolled with this tribe, would continue to live in Porterville and she did not want them to experience any ill effect of anticipated conflict with the tribe; she stated that she anticipated a two to three year struggle with the tribe and she did not want to remain in California past 05/2007; she decided that she could not commit to the long term care of the [children] regarding their attachment disorder issues and their developmental needs.

"The current caretakers had transition visits prior to the placement of the [children], and accepted the [children] with the commitment to the children's long term care. The current caretakers meet ICWA requirements and remain very much committed to the permanency of raising the children as their own. This writer is not recommending a change in placement and does not support a change in placement.

"In this writer's professional opinion, moving the children would exacerbate their attachment disorder issues. They are currently in their fifth placement and another move would be emotionally harmful to them.

"The children continue to receive therapeutic services from [Synchrony] and their therapist supports the children remaining with their current caretakers. A copy of their statement is attached."

The statement from Synchrony included the following:

"As you know, [the children] were first seen in our offices . . . on November 2006. . . . The results were that [the second oldest child] was given the diagnosis of Reactive Attachment Disorder (RAD) and [the oldest child] was also given the diagnosis of being at risk for an Attachment Disorder (Anxious Attachment).

"Both [children] began treatment at [Synchrony] on 8/23/07. . . . Treatment for the girls has included family therapy and individual therapy to address their attachment related diagnoses. Due to the fact that their Early Mental Health evaluation and diagnoses were given while in a previous placement and under different circumstances an updated evaluation is currently underway. The preliminary results of this update are that both [children] do suffer from Reactive Attachment Disorder. Upon completion of this updated evaluation further detail will be available.

"In cases of RAD, if not intervened upon effectively the condition follows a continuing course. At this point it is recommended that in addition to both [children] continuing to receive mental health services that every effort is made to keep their home environment consistent. Further, children with RAD, including [these children] required caretakers who are loving, accepting of the girls' current level of functioning, are responsive to their special needs, do not engage in control battles, and who provide appropriate supervision and discipline instead of punishment. [The current caregivers] have demonstrated they are consistently providing this type of stable home environment. [The current caregivers] have further demonstrated their dedication to these girls and motivation to learn by regularly attending treatment sessions and engaging in parental education about how to care for RAD children.

"It is recommended that [the children] remain in their current placement (placed as of 5/15/07) for the above stated reasons but even more importantly because of the significant psychological progress the girls have made while in this placement. They have been making important strides in their attachment potential and are growing in their secure attachment with the [current caregivers]. If these children were to be moved, it would be detrimental to

their development and integration of a healthy sense of self and safety in the world. Moving these girls would reinforce their negative inner pattern of relating to self and others, exacerbating their attachment disorders, significantly decreasing the chance of recovery and healing."

Also attached to the followup memo was an "Indian Child Welfare Affidavit" from ICWA expert Ricardo Carrillo, Ph.D. In the summary and recommendation portion of his affidavit, Dr. Carrillo offered his opinion that the continued custody of the children by their biological parents was likely to result in serious permanent emotional or physical damage to the children. (25 U.S.C. § 1912(e), (f); see also Welf. & Inst. Code, § 361.7, subd. (c).) Dr. Carrillo added: "[The father] is incarcerated in state prison and [the mother] is homeless and cannot be found. She may be considered a successful failure at treatment and services offered. She has lost custody of four children to date, has failed to comply or successfully engage in drug or mental health treatment dating back to October of 1997. It is the recommendation of this evaluator that the children be permanently placed in a safe and secure home and not moved from that home. The traumatic symptoms have the possibility of resolving with natural development and a safe and secure attachment from the caretakers."

Meanwhile, the former relative caregivers and the ICWA coordinator submitted letters to the court favoring change in placement. One of the relative caregivers even e-mailed the court. Since none of these documents was offered, let alone admitted into evidence, we do not detail their contents here.

Eventually, the court conducted an evidentiary section 366.26 hearing on January 8, 2008. The day before the hearing, the ICWA coordinator submitted the declaration of Mr. G., one of the former relative caregivers. The agency also submitted another updated report emphasizing its position that the court should select a permanent plan of adoption for the children.

In his declaration, which the court received into evidence, Mr. G. explained:

"5. I am related to the [children] as their first cousin twice removed. My paternal aunt, who died this year, was the minors' great-grandmother.

"6. When we were initially contacted by the agency as a placement option, it was in August 2005, and we were asked if we could take all three siblings, . . . into our home. Because we were only licensed to take two children into our foster home, only [the sibling] was initially placed with us. When our application to have three children placed in our home was approved, we agreed to have [the children] move into our home. [The children] were placed with us on or about September 21, 2006.

"7. After securing services to assist [the children] with behavioral and emotional issues, we planned to adopt all three of the siblings. We had also been planning our move to South Dakota for some time prior to their placement with us and intended to move after our son's wedding on June 9, 2007. When the [Tribe] and the girls' family learned of our intention to move to South Dakota, they contacted us and let us know that they were upset and concerned about the move. The [Tribe's ICWA Coordinator] let us know that the Tribe would oppose an adoptive placement of [the children] with us in South Dakota because the maintenance of the girls' ties with their mother, extended family and tribal community was in the girls' best interest and there was still hope that the mother might reunify with [the children]. [Tribe's ICWA Coordinator] informed us that the Tribe would agree to our adopting [the sibling] if we would relinquish our intention to adopt [the children]. At that time, the Tribe anticipated opening a foster care facility on its reservation and intended to have [the children] placed there. We agreed and [the sibling] adoption was finalized in March of 2007.

"8. Although we were anticipating a slow transition of [the children] out of our home, to be finalized before our move in June 2007, the girls' current foster parent asked social worker Maria Kallai for a speedier transition, and the girls were removed from our home on or about May 15, 2007.

"9. Since completing our move to South Dakota, we have contacted the agency's social worker and the current foster parents of [the children] to request sibling contact for our adopted daughter, but they have each denied our requests. Although the three siblings did not live together immediately after their removal from their biological mother, they did live together in our home for eight months and established a close sibling relationship during that time. We believe it is in all three siblings' best interests to have contact and visitation and would like this court to affirm its prior finding of August 1, 2006, that sibling visitation was in the children's best interest and order contact by phone and mail for the siblings as well as visitation when we visit California, as we intend to do regularly.

"10. We have taken steps to promote a strong identity for our adopted daughter as an Indian child and would do the same for [the children] if they were placed with us. For example, in Rapid City, the Sioux San Hospital, an Indian Health Services Provider, operates a number of culturally appropriate programs and services for Indian children and families, such as Youth and Family Services infant to five Head Start program, in which our adopted daughter is enrolled. We also regularly attend pow wows, which our adopted daughter participates in as a jingle dress dancer. I also maintain ties with the Tribe and my extended family who live on or near the [Tribe's] Reservation.

"11. We were recently contacted by [Tribe's ICWA Coordinator] who stated that the Tribal Council had reconsidered its prior decision to oppose placement of [the children] with us in South Dakota in light of delays in the establishment of the tribal foster care facility and their desire not to have the children adopted outside of the extended family and the Tribe.

"12. My wife and I strongly desire to have [the children] placed with us on a permanent basis under whatever permanent plan is deemed best for the children by the Tribe and the court. We believe this placement would be in the girls' best interests because it would reunite them with their youngest sister, to whom they grew attached while they lived with us, as well as us, who had established a positive and loving relationship with the children."

In its update report, the agency reported:

"The purpose of this report is to emphasize to the court that the Permanent Plan of adoption by the current foster parents remain the same.

"The current foster parents accepted placement of the minors with the plan of adoption.

"Although the children have attachment disorder related issues, they have been receiving mental health services and their foster parents have been central to and participated in therapeutic services. The children have exhibited, albeit slowly, improvements in their behaviors and in the attachment process.

"The foster parents meet ICWA eligibility requirements and the initial placement match was made with this criterion in mind.

"The former foster parents, [Mr. and Mrs. G.], now of Minot, South Dakota, asked the agency in early 2007 to move the children because they, [Mr. and Mrs. G.], did not want to wait through the adoptions process, they wanted to move in the spring of 2007 to South Dakota, they expected that the [Tribe] would contest their interest in adopting the children, and they did not want to battle the [Tribe] because two of their young adult children remained in Porterville and [Mr. and Mrs. G.] did not want those two children, who are enrolled with the [Tribe], to experience future conflict.

"In this writer's opinion, the children are healthy, and are attaching to their new caretakers. The caretakers are committed to the plan of adoption and to whatever the future holds. The current caretakers have and continue to work diligently with the children and their mental health provider on improving the children's emotional well-being. To move the children again would contribute

to significant emotional harm to these children and would be detrimental to the children and hurtful to the commitment by their caretakers."

At the start of the January 8, 2008, hearing, the court received into evidence the agency's three reports filed in November 2007, December 2007, and January 2008, including attachments. As previously noted, it also received Mr. G.'s declaration into evidence. It granted as well the agency's request for judicial notice of the entire case file.[5] The parties further stipulated to the court's receipt into evidence of the Indian child welfare affidavit, subject to cross-examination.

The Tribe's counsel then cross-examined the ICWA expert, Dr. Carrillo, regarding his conclusions. Asked what was in the best interest of the children, Dr. Carrillo testified: "That they be in a safe and secure environment. These children have been placed multiple times. They have developmental difficulties. They need the secure attachment to be placed someplace safe for the long term since their parents can't take care of them."

In response to further questions by the Tribe's attorney, the ICWA expert testified he had not had any contact with the children's former relative caregivers because that was not part of his evaluation. "The only opinion I render is that the children are in a foster placement right now and how they are doing right now in that foster placement. I cannot render any opinion about anybody else."

The ICWA expert added: "No, I cannot render an opinion about the [former relative caregivers]. I can tell you that the children have suffered severe attachment disorders because they have not had a consistent relationship where they can develop. They were born drug exposed. They have nightmares. They have difficulty talking and communicating. They are very clingy in their relationships. So whoever they are going to be with they need to be placed somewhere on a permanent basis with somebody who cares about them and certainly who can attend to them. I don't know if the [former caregivers] are the people that can do that for them. I don't know them." No further evidence was submitted on the matter.

During closing arguments, the Tribe's counsel argued that termination of parental rights in the children's current placement was not in their best interests because termination and adoption by the current caregivers would substantially intervene with the children's connection to family and because the Tribe had identified guardianship as the desired permanent plan.

---

[5] Respondent asks this court to take judicial notice of documents not contained in this appellate record. As those documents do not appear relevant to the issues raised on appeal, we deny the request.

The Tribe's counsel went on to argue against placement with the current caregivers, claiming it was not the Tribe's preferred placement for the children. The Tribe's preferred placement was with the former relative caregivers. In the Tribe's view, the agency had not shown good cause to maintain the children's current placement because neither the opinion of the Synchrony staff nor the ICWA expert considered whether the children's removal for placement specifically with the former relative caregivers would be detrimental to them.

The attorney for the Tribe also represented that his client acknowledged regret that the children were removed from the former relative caregivers' home. The Tribe also purportedly always opposed termination of parental rights for the children. "In our way and custom, you can't terminate parental rights ever." Counsel further criticized the current caregivers for allegedly not demonstrating a willingness to maintain Tribal and family relationships for the children.

In conclusion, the Tribe's counsel represented that the Tribe would support termination of parental rights for the sole purpose of attempting an adoption by the former relative caregivers if the court determined such a permanent plan better promoted the children's best interests. Alternatively, the attorney asked the court to consider guardianship as the culturally appropriate plan for the children and to follow the Tribe's placement preference.

The court then inquired of the Tribe's counsel if it was the Tribe's position, at the time placement was made with the current caregivers, that the agency did not comply with the ICWA placement requirements. The attorney replied, "No, it is not."

Following additional argument by counsel for the other parties, the court took the matter under submission and continued the hearing to the end of January 2008 for its decision. This led to a flurry of activity by the agency and the Tribe to submit additional evidence for the court's consideration, including the agency's motion to reopen the hearing.

At the further hearing on January 29, 2008, the court denied the motion to reopen and announced it would not consider any evidence filed after the January 8, 2008, evidentiary hearing.[6] The court then found the children adoptable, expressly finding that the current caregivers were committed to adoption and the former relative caregivers were willing to commit to whatever plan was deemed appropriate. "[T]hus, despite the diagnosis of

---

[6] Since no one challenges the court's ruling in this regard, we will neither summarize nor consider the proffered evidence.

reactive attachment disorder, they are adoptable." The court also agreed with the ICWA expert and found beyond a reasonable doubt that the children's continued custody by the biological parents was likely to result in serious permanent emotional damage to the children. The court further adopted other recommended findings and orders as submitted by the agency. Those findings included an active-efforts finding, as required by ICWA and section 361.7, subdivision (a).

Finally, the court addressed whether the agency complied with the ICWA placement preference (25 U.S.C. § 1915; Welf. & Inst. Code, § 361.31) and, if not, whether good cause existed for noncompliance. It observed it could find no authority for fixing the precise point at which the agency must comply, at the time of initial placement or when the court was selecting the permanent plan. The court found the agency did comply when it placed the children with the current caregivers and that the former relative caregivers chose, with the consent and at the apparent urging of the Tribe, to relinquish custody of the children. If on the other hand the placement preference must be complied with at the time of the permanency hearing, the court found the preference had not been met and that good cause existed for the agency's noncompliance. The court cited the letter from the Synchrony staff and the opinion of the ICWA expert. Finding the children had extraordinary emotional needs, the court concluded there was good cause.

## DISCUSSION

### I. Adoptability

Appellants contend there was insufficient evidence to support the court's finding that it was likely the children would be adoptable. According to appellants, the court solely and improperly relied on the willingness of the children's current and former caregivers to adopt without considering whether the children were generally adoptable, what the impact of their emotional or behavioral problems was on the likelihood of their adoption, and whether the current caregivers could meet the children's particular needs.

The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82] (*Sarah M.*).) It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent " 'waiting in the wings.' " (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223, fn. 11 [4 Cal.Rptr.2d 101].)

Conversely, the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child. In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. (*Sarah M., supra,* 22 Cal.App.4th at pp. 1649–1650.) Having reviewed the record as summarized above, we conclude there was substantial evidence to support the court's adoptability finding. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379 [97 Cal.Rptr.2d 746] (*Brison C.*).)

### A. Substantial evidence of adoptability

The children were young, three and four years old, and physically healthy. Each child's expressive and receptive language skills previously were diagnosed as delayed. However, each child was making progress through early intervention preschool programs. Neither child received services with the Central Valley Regional Center. Their current caregivers saw the children as "very bright[;] they just need the proper environment, avenue [and] skills to flourish."

The children also shared a close relationship with one another, although each child exhibited sibling rivalry and conflict. They sometimes fought over toys and were aggressive toward one another, requiring a high level of parental intervention and redirection. On the other hand, they played well with other children and were "good meeting new people."

In addition, each child had been diagnosed since late 2006 with an attachment disorder. They received regular family and individual therapy and, in spite of the disorder, had made significant psychological progress while in their current placement, as well as important strides in their attachment potential. With the help of counseling and support groups, their current caregivers saw "a bright future" for the children. Despite the children's current emotional and behavioral problems, their current caregivers had not wavered from their commitment to raising the children as their own, advising the court, "[w]e are 100% committed to these girls. It's an adjustment for everyone but I think we are all doing well." Finally, not only were the children's current caregivers committed to adoption, their former relative caregivers had made a request for adoptive placement.

Given the children's positive attributes, the progress they were making in overcoming their behavioral and emotional problems, as well as the current and former caregivers' willingness to adopt them, the court properly could

find that it was likely the children would be adopted. (§ 366.26, subd. (c)(1).) To the extent appellants contend the trial court solely relied on the caregivers' willingness to adopt in reaching its decision, we are not persuaded. The juvenile court's reasoning is not a matter for our review. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) It is judicial action not judicial reasoning which is the proper subject of appellate review. (*El Centro Grain Co. v. Bank of Italy, etc.* (1932) 123 Cal.App. 564, 567 [11 P.2d 650].)

Further, appellants approach the question of the children's adoptability by picking and choosing evidence from the record in support of their argument. This is not an approach we may follow on review. The power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination of whether there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. (*Brison C., supra*, 81 Cal.App.4th at pp. 1378–1379.) All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an independent judgment on the evidence. (*In re Laura F.* (1983) 33 Cal.3d 826, 833 [191 Cal.Rptr. 464, 662 P.2d 922] (*Laura F.*).)

### B. *"Generally adoptable" is not a required finding*

■ Contrary to appellants' claim, the law does not require a juvenile court to find a dependent child "generally adoptable" before terminating parental rights. All that is required is clear and convincing evidence of the likelihood that the dependent child will be adopted within a reasonable time. (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 [2 Cal.Rptr.3d 683, 73 P.3d 541]; § 366.26, subd. (c)(1).) The likelihood of adoptability *may* be satisfied by a showing that a child is *generally* adoptable, that is, independent of whether there is a prospective adoptive family " ' "waiting in the wings." ' " (*In re Jayson T.* (2002) 97 Cal.App.4th 75, 85 [118 Cal.Rptr.2d 228], disapproved on another ground in *In re Zeth S., supra*, 31 Cal.4th at pp. 413–414.) However, the case law also recognizes that the juvenile court may properly consider a prospective adoptive parent's willingness to adopt as evidence that the child is likely to be adopted within a reasonable time. (*Sarah M., supra*, 22 Cal.App.4th at pp. 1649–1650.)

### C. *No requirement of additional approved families*

Case law does not require evidence of additional approved families who are available and willing to adopt the children. Appellants' reliance on cases such as *In re Jerome D.* (2000) 84 Cal.App.4th 1200 [101 Cal.Rptr.2d 449]

(*Jerome D.*) is misplaced. In *Jerome D.*, the appellate court reversed an adoptability finding that it concluded was based on the willingness of a child's stepfather to adopt him. The *Jerome D.* court held that such evidence would not suffice because the adoption assessment failed to address the stepfather's criminal and child protective services history, which was considerable, as required by section 366.22, subdivision (b)(4). (*Jerome D., supra*, 84 Cal.App.4th at p. 1205.) Although the *Jerome D.* court observed there was no evidence of any approved families willing to adopt the child, appellants ignore the lack of any holding requiring this proof, as well as the factual dissimilarity between *Jerome D.* and the present case.

### D. Caregivers' ability to meet the children's needs

Next, appellants' claim of insufficient proof that the current caregivers could meet the children's particular needs is not only factually incorrect but is based on a legally faulty premise. Ignoring the children's positive attributes and their former caregivers' expressed desire to adopt, appellants claim the children could only be considered adoptable because a particular family—the current caregivers—were willing to adopt. Appellants go on to cite *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062 [27 Cal.Rptr.3d 612] (*Carl R.*) for the proposition the trial court had no information from which to determine whether the current caregivers could meet the children's particular needs. We disagree.

 There was evidence, as required by statute, of the current caregivers' capacity to meet the children's needs. Section 366.21, subdivision (i)(1)(D), mandates the following as part of the agency's written assessment for purposes of a section 366.26 hearing: "A preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian, particularly the caretaker, to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship."

In its preliminary assessment under the subheading "Capability to Meet Child(ren)'s Needs," the agency wrote: "The current foster parents have provided for the minors' emotional and material needs since the children were placed in 05/2007. They have been diligent in providing the children with educational and mental health services, and have a good support network. The current foster parents have demonstrated their capabilities to meet the minors' multiple needs."

The November 2007 letter from the Synchrony staff also supported this assessment by noting the "significant psychological progress the girls [had]

made while in this placement." A social worker update from early January 2008 revealed the current caregivers were "central to and participated in the therapeutic services."

On appeal, appellants criticize the lack of specifics regarding whether the current caregivers had specialized training or prior experience raising children as well as the current caregivers' apparent decision to discontinue play therapy for the children. This criticism appears to be an attack on the current caregivers' suitability to adopt, which is not a proper subject of inquiry at a section 366.26 hearing. (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844 [16 Cal.Rptr.2d 766].)

In any event, appellants' criticisms do not take away from the substantial evidence supporting the court's adoptability finding. There was no evidence that these children needed caregivers with specialized training or prior parenting experience. As for the play therapy, which began in December 2006, its purpose was to help determine *why* the children fought and to *understand* the nature of their communication delays, not necessarily to treat these problems. In turn, the play therapist would make referrals for other services. The evidence was undisputed that, by the summer of 2007, the play therapy was no longer beneficial. Further, the record is undisputed that the current caregivers were working with the Synchrony staff to help the children with the bonding process and their attachment disorder issues, as well as help them decrease their behavior problems.

Last, we disagree with appellants' claim, pursuant to *Carl R.*, that a greater showing was necessary. *Carl R.* is so factually distinguishable from the present case as to be of little factual or legal significance. Carl R. suffered severe disabilities to the extent that he would *always* require total care. Although he was approximately eight years old, the child lived for most of his life in a convalescent hospital and had the emotional maturity of an eight-month-old infant. (*Carl R., supra*, 128 Cal.App.4th at p. 1058.) At trial, the court confronted competing claims over whether he should be freed for adoption by a family who would home school him.

As the *Carl R.* court observed, the appellate issue was "very narrow—what is the proper scope of the inquiry by the juvenile court in determining the adoptability of a child who will require intensive care for life?" (*Carl R., supra*, 128 Cal.App.4th at p. 1062.) In resolving this issue, the appellate court observed that, where the child is deemed adoptable based solely on the fact that a particular family is willing to adopt him or her, the trial court may consider whether the family can meet the particular needs of the child. (*Ibid.*)

The *Carl R.* court concluded the juvenile court sufficiently assessed the prospective parents' ability to meet the child's educational needs; an inquiry into their specific educational plan was unwarranted. *Carl R.* does not compel a different result in this case.

### E. Adequacy of the agency's assessment report

In a final effort to attack the court's adoptability finding, appellants contend the agency's assessment report on the children did not substantially comply with all of the statutory requirements for such a report.[7] In appellants' view, the assessment did not provide: (1) enough specificity about the children's contact with their parents, younger sibling, their extended family members, including their former relative caregivers; and (2) updated information on the final outcome of the children's mental health evaluations and the older child's Individual Education Plan, which were pending as the agency prepared their assessment in November 2007. Appellants also criticize the agency for not reporting on the former relative caregivers as prospective adoptive parents under section 366.21, subdivision (i)(1)(D) and (E). Further, appellants argue the agency should have addressed in its assessment whether the current caregivers, as a same-sex couple, could jointly adopt the children.

---

[7] The assessment, which provides the information necessary for the juvenile court to determine the likelihood of the dependent child's adoptability (§ 366.26, subd. (c)(1)), shall include:

"(A) Current search efforts for an absent parent or parents or legal guardians.

"(B) A review of the amount of and nature of any contact between the child and his or her parents or legal guardians and other members of his or her extended family since the time of placement. Although the extended family of each child shall be reviewed on a case-by-case basis, 'extended family' for the purpose of this subparagraph shall include, but not be limited to, the child's siblings, grandparents, aunts, and uncles.

"(C) An evaluation of the child's medical, developmental, scholastic, mental, and emotional status.

"(D) A preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian, particularly the caretaker, to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship. If a proposed guardian is a relative of the minor, and the relative was assessed for foster care placement of the minor prior to January 1, 1998, the assessment shall also consider, but need not be limited to, all of the factors specified in subdivision (a) of Section 361.3.

"(E) The relationship of the child to any identified prospective adoptive parent or legal guardian, the duration and character of the relationship, the motivation for seeking adoption or guardianship, and a statement from the child concerning placement and the adoption or guardianship, unless the child's age or physical, emotional, or other condition precludes his or her meaningful response, and if so, a description of the condition.

"(F) A description of efforts to be made to identify a prospective adoptive parent or legal guardian, including, but not limited to, child-specific recruitment and listing on an adoption exchange within the state or out of the state.

"(G) An analysis of the likelihood that the child will be adopted if parental rights are terminated." (§ 366.21, subd. (i)(1).)

Notably, no one challenged the adequacy of the agency's assessment on any grounds, let alone on the grounds appellants now raise. Having failed to object to the assessment's adequacy in the juvenile court, appellants have waived any such objection on appeal. (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623 [121 Cal.Rptr.2d 326].) In this regard, we distinguish appellants' right to raise the sufficiency of the evidence to support the adoptability finding even though they did not argue the issue in the juvenile court. This is because it is the agency's burden to establish a dependent child's adoptability. (See *In re Chantal S.* (1996) 13 Cal.4th 196, 210 [51 Cal.Rptr.2d 866, 913 P.2d 1075].) To the extent appellants rely on *In re Valerie W.* (2008) 162 Cal.App.4th 1, 13–16 [75 Cal.Rptr.3d 86] (*Valerie W.*), in which the appellate court determined an assessment statutorily inadequate resulting in a conclusion that substantial evidence did not support an adoptability finding, they overlook the fact that the parties in *Valerie W.* did challenge the assessment's adequacy in the trial court. (*Id.* at p. 7.) Consequently, *Valerie W.* does not persuade us to consider appellants' criticisms for the first time on appeal.

## II. Active efforts to provide remedial services

Appellants challenge the court's ICWA finding that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful. (25 U.S.C. § 1912(d); Welf. & Inst. Code, § 361.7, subd. (a).) Specifically, they criticize the agency and the court for not placing the children with their relatives until September 2006. They also contend that neither the agency nor the court took the Tribe's prevailing social and cultural standards into account when the former relative caregivers, supported by the Tribe, once again requested placement at the section 366.26 hearing. Under these circumstances, appellants argue there was insufficient evidence to support the active-efforts finding.

Both ICWA and now section 361.7, subdivision (a), provide: "[A] party seeking an involuntary foster care placement of, or termination of parental rights over, an Indian child shall provide evidence to the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

■ Historically, courts in California have interpreted the active-efforts finding as "essentially undifferentiable" from a reasonable-reunification-services finding. (See, e.g., *In re Michael G.* (1998) 63 Cal.App.4th 700, 712–714 [74 Cal.Rptr.2d 642] (*Michael G.*).) "The phrase 'active efforts,' construed with common sense and syntax [citation], seems only to require that timely and affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designed to remedy problems which might lead to

severance of the parent-child relationship." (*Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016 [97 Cal.Rptr.2d 303].) "Under the ICWA, however, the court shall also take into account 'the prevailing social and cultural conditions and way of life of the Indian child's tribe. [Remedial services] shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers.' " (*Michael G., supra*, 63 Cal.App.4th at p. 714, citing Guidelines, 44 Fed.Reg. 67592, § D.2.)

Now, with the Legislature's incorporation of ICWA standards into our dependency law, it has endorsed the Guidelines approach taken in *Michael G.* with the following direction: "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).) To date there is no published case law interpreting section 361.7, subdivisions (a) and (b).

Preliminarily, we observe that the agency argues appellants have forfeited the right to complain on appeal about the time it took to place the children with their relative caregivers because they should have raised the issue in an earlier appeal or writ. To the extent appellants criticize the agency's effort at the outset of these proceedings, we agree with the agency. The court made an active-efforts finding as part of its order for foster care placement at the September 2005 dispositional hearing. Neither the mother nor the Tribe appealed that decision which is now final and no longer subject to our review. (*In re Elizabeth M.* (1991) 232 Cal.App.3d 553, 563 [283 Cal.Rptr. 483] [appeal from most recent order entered in dependency matter may not challenge prior orders for which statutory time for filing appeal has passed].) Otherwise, we assume appellants may argue the active-efforts issue because the court did not make another active-efforts finding until it reached its decision to terminate parental rights. Either way, appellants' argument is not persuasive.

Appellants fail to cite any authority for the proposition that, in order for a court to make an active-efforts finding under section 361.7, subdivision (a), it must consider, as part of or in addition to remedial services and rehabilitative programs, the issue of the Indian child's placement. No doubt placement of an Indian child is an important issue. The United States Supreme Court, in *Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30, 36 [104 L.Ed.2d 29, 109 S.Ct. 1597], described ICWA's placement preference as the most important substantive requirement imposed on state courts. However, ICWA and now California's statutory law address the issue of an Indian child's placement separately from the issue of active efforts. (See 25 U.S.C.

§ 1912(d); Welf. & Inst. Code, § 361.31.) Following their lead, we distinguish the issue of placement from that of active efforts.

In any event, appellants ignore the fact that "active efforts" pertains to "remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." (§ 361.7, subd. (a).) As a result, even if an active efforts finding under section 361.7, subdivision (a) should now be interpreted to include services related to placement, it also incorporates what we would otherwise refer to as reunification services. Here, there is no suggestion by appellants that the agency failed to provide the mother with remedial services and rehabilitative programs designed to prevent the family's breakup. Unfortunately, she simply failed to participate in any meaningful way in the services she was provided.

In addition, as the former relative caregivers' declaration disclosed, the agency could not place the children with them any earlier than it did. The relative caregivers' foster care license did not permit them to care for more than two children. Moreover, those relatives apparently chose to have the children's sibling placed first with them. Once the relative caregivers obtained a foster care license for three children, the agency placed the children with them. Even if the former relative caregivers had not been licensed foster parents, they still would need to meet licensing standards for a foster family home. (§§ 309, subd. (d)(1), 361.3, subd. (a)(8).)

 Here, there apparently was an issue over sufficient space in the former relative caregivers' home. To the extent appellant mother contends the former relative caregivers' home did not have to meet these standards, we disagree. The law exempting homes of extended family members of an Indian child from licensing requirements under the Community Care Facilities Act (Health & Saf. Code, § 1505, subd. (*o*)(1)) does not support appellants' contention. In even non-ICWA dependencies, homes of relative caregivers are exempt from such licensing requirements. (Health & Saf. Code, § 1505, subd. (*l*)(1).) Nevertheless, all of these homes must meet standards to assure a court of the appropriateness of the placement. (See § 361.4 [which refers to ICWA placements as well as non-ICWA placements].)

On this record, we are persuaded there was substantial evidence to support the trial court's second active-efforts finding.

*III. Issue of detriment*

Next, appellants claim that, because the Tribe argued the children were Indian children and, in its view, there were compelling reasons for determining parental rights termination would not be in their best interests (§ 366.26, subd. (c)(1)(B)(vi) (Indian Child Exception)), the court erred by neither

addressing this argument in its decision to terminate nor finding termination would be detrimental under the Indian Child Exception. We disagree with both claims of error.

 Once reunification services are ordered terminated, the focus shifts to the needs of dependent children for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].) A section 366.26 hearing is designed to protect these children's compelling rights to have a placement that is stable, permanent, and allows the caretaker to make a full emotional commitment to the child. (*In re Marilyn H., supra*, at p. 306.) If, as in this case, the children are likely to be adopted, adoption is the norm. Further, the court must terminate parental rights and order adoption, unless one of the specified circumstances in section 366.26, subdivision (c)(1), provides a compelling reason for finding that termination of parental rights would be detrimental to the child. (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [1 Cal.Rptr.3d 432, 71 P.3d 787] (*Celine R.*).) "The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' (*In re Jasmine D.* [(2000)] 78 Cal.App.4th [1339,] 1348 [93 Cal.Rptr.2d 644].) At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' (*Cynthia D. v. Superior Court* [(1993)] 5 Cal.4th [242,] 256 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) The statutory exceptions merely permit the court, in *exceptional circumstances* (*In re Jasmine D., supra*, at pp. 1348–1349), to choose an option other than the norm, which remains adoption." (*Celine R., supra*, 31 Cal.4th at p. 53.)

Over the years, the list of statutory exceptions has grown. (See *Celine R., supra*, 31 Cal.4th at p. 53.) Effective January 1, 2007, the Legislature added the Indian Child Exception, which provides:

"(vi) The child is an Indian child and there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, including, but not limited to:

"(I) Termination of parental rights would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights.

"(II) The child's tribe has identified guardianship, long-term foster care with a fit and willing relative, or another planned permanent living arrangement for the child." (§ 366.26, subd. (c)(1)(B)(vi); formerly § 366.26, subd. (c)(1)(F).) To date, there is no published case law interpreting this exception.

### A. No requirement for an expressed finding

Appellants theorize that, when a party raises a statutory exception to termination, a juvenile court must address that exception one way or another in its decision by expressly finding it does or does not apply. If a trial court does not expressly address an argued exception, appellants claim we may not imply a negative finding and instead should conduct an independent review of the record. Here, appellants claim we should conclude that the Indian Child Exception did apply and reverse the termination order.

 Although appellants cite numerous authorities in their argument, they do not cite any that support their position. They also do not recognize well-established case law to the contrary. A finding of no detriment is not a prerequisite to the termination of parental rights. (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1347.) The Legislature demands an express finding on the matter of detriment *only* when the trial court determines detriment exists and relies upon it to refuse to enter an otherwise proper termination order. (*In re Jesse B.* (1992) 8 Cal.App.4th 845, 851 [10 Cal.Rptr.2d 516] (*Jesse B.*); § 366.26, subd. (c)(1)(B) [if court finds termination detrimental pursuant to any statutory exceptions, it must state reasons].) Otherwise, when the trial court issues a termination order, the appellate court will assume, in the absence of a contrary indication in the record, that the trial court considered the question of detriment and will imply, from the entry of a termination order, a negative finding on the question of detriment. (*Jesse B., supra*, at p. 851.) Alternatively, because an exception's proponent bears the burden of proof on the exception, the reviewing court properly may assume the trial court was not persuaded by the evidence to find detriment. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343 [63 Cal.Rptr.2d 562] (*Lorenzo C.*).)

Here, although appellants assume the trial court ignored the Tribe's argument, there is no affirmative showing in the record to that effect. As a result, we will imply from the trial court's decision to terminate that it did consider the matter (*Jesse B., supra*, 8 Cal.App.4th at p. 851) and rejected it, either because the court was not persuaded by the Tribe's argument or because it decided that termination would not be detrimental. Again, the court's rationale is not the subject of our review. (*Davey v. Southern Pac. Co., supra*, 116 Cal. at p. 329.) Rather, the issue is whether the court abused its discretion (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1351) by not finding the Indian Child Exception applied.

### B. The Indian Child Exception

As appellants contend, the Indian Child Exception in section 366.26, subdivision (c)(1)(B)(vi), creates a best-interest exception to parental rights

termination for an Indian child. There is no general best-interest exception to termination for dependent children under section 366.26. (*In re Barbara R.* (2006) 137 Cal.App.4th 941, 955 [40 Cal.Rptr.3d 687].) Rather, the court considers whether termination would be detrimental due to one or more of the circumstances outlined in section 366.26, subdivision (c)(1)(B). (See *Celine R., supra*, 31 Cal.4th at p. 53.)

█ The Indian Child Exception, however, now authorizes a court to consider whether there is a compelling reason for determining that termination of parental rights would not be in an Indian child's best interest. Also, the Indian Child Exception includes two reasons a court may find compelling: one, if termination of parental rights would interfere substantially with the child's connection to his or her tribal community or the child's tribal membership rights (§ 366.26, subd. (c)(1)(B)(vi)(I)); and two, if the child's tribe has identified guardianship, long-term foster care with a fit and willing relative, or another planned permanent living arrangement for the child (§ 366.26, subd. (c)(1)(B)(vi)(II)). However, the subdivision does not limit the court to these two reasons. As the Indian Child Exception states, "there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, *including, but not limited to*" the two articulated reasons. (§ 366.26, subd. (c)(1)(B)(vi), italics added.)

In this way, as appellants point out, the Indian Child Exception confers broader discretion to the court, in the case of an Indian child, than it would otherwise possess at a permanency planning hearing to consider whether termination would be detrimental to an adoptable child. Presumably, the reasons a court may find compelling under the Indian Child Exception will somehow relate to the Indian child's membership in his or her Indian tribe and connection to the tribal community. (§ 224, subd. (a)(2).) The Legislature, in section 224, subdivision (a)(2), has declared this as an interest of an Indian child to be encouraged and protected.[8] In our view, the Indian Child Exception is not so broad as to include any argument a parent or tribe may assert. To be clear, however, whether a compelling reason exists under the Indian Child Exception is an issue committed to the trial court as the trier of fact and its discretion to resolve whether, on any statutory grounds, that termination would be detrimental to an otherwise adoptable child. (§ 366.26, subd. (c)(1)(B).)

---

[8] Section 224 is a declaration of legislative intent regarding the implementation of the ICWA in California. Section 224, subdivision (a)(2), states: "It is in the interest of an Indian child that the child's membership in the child's Indian tribe and connection to the tribal community be encouraged and protected, regardless of whether the child is in the physical custody of an Indian parent or Indian custodian at the commencement of a child custody proceeding, the parental rights of the child's parents have been terminated, or where the child has resided or been domiciled."

We now turn to the question whether the trial court abused its discretion in this case. As discussed below, we conclude that the trial court did not when it terminated parental rights.

In its closing argument, the Tribe represented it would support termination of parental rights for the sole purpose of adoption by the former relative caregivers. Otherwise, the Tribe advocated that termination and adoption by the current caregivers was not in the children's best interests under the Indian Child Exception because they were Indian children and termination would substantially intervene "with the children's connection with family." Also, the Tribe claimed it had identified guardianship as the appropriate permanent plan.[9] The Tribe later added it had always opposed termination of parental rights because "[i]n our way and custom, you can't terminate parental rights ever."

On appeal, appellants argue the trial court should have found that termination and adoption by the current caregivers would be detrimental for three reasons under the Indian Child Exception. First, it would substantially interfere with the children's relationship with their sibling; second, it would substantially interfere with their connection to the tribal community; and third, the Tribe had identified guardianship as a more appropriate plan.

Significantly, the Tribe never argued the first two of these claims to the trial court. It neither claimed nor produced any evidence that termination would interfere substantially with either the children's relationship with their sibling or their connection to the tribal community. At most, there was Mr. G.'s declaration that he twice tried to arrange contact and allegedly had no success. Having not raised those issues and asked the trial court to exercise its discretion, appellants are not entitled to relief on those grounds. (*Lorenzo C., supra*, 54 Cal.App.4th at p. 1339.) The trial court has no sua sponte duty to determine whether an exception to adoption applies if it is not raised by a party. (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295 [7 Cal.Rptr.3d 153].) When, as here, the law does not require the juvenile court to act in a certain way, appellants bear the responsibility to care for their own interests by asking the court to exercise its discretion in a manner that is favorable to them and presenting persuasive evidence in that regard to the court. (*Lorenzo C., supra*, 54 Cal.App.4th at p. 1339.)

[9] We quote verbatim the Tribe's entire argument in this regard:

"The tribe submits that termination of parental rights in the current placement of [the children] are not in their best interest because termination of parental rights and adoption by the current caregiver substantially intervenes with the children's connection with family and we recognize it is in the best interest of the children at this time. These are Indian children. The Tribe has indentified guardianship as the desired permanent living arrangement.

"Pursuant to section 366.26, subdivision (c)(1)[(B)(vi)], of the Welfare and Institutions Code, termination of parental rights is not appropriate in these circumstances."

■ Under the circumstances, there was no need for the trial court to address the Tribe's argument that termination would interfere "with the children's connection with family." A child's "connection with family" is not one of the statutory exceptions that applies to adoptable children in general. There are three statutory exceptions that reference a familial relationship: (1) where a *parent* has maintained regular visitation and contact with a child who would benefit from continuing that relationship (§ 366.26, subd. (c)(1)(B)(i)); (2) where termination would interfere substantially with a child's *sibling* relationship, taking into account a number of factors (§ 366.26, subd. (c)(1)(B)(v)); and (3) the child is living with a *relative* who is unable or unwilling to adopt but still willing and capable of providing for the child through guardianship (§ 366.26, subd. (c)(1)(A)). In any event, the Tribe never expanded on what it meant by the "connection with family" argument to even remotely suggest that it was arguing one or more of these circumstances.

In addition, the Tribe did not introduce any evidence to support, much less compel, a detriment finding under one of these circumstances. At most, there was Mr. G.'s claim of a close sibling relationship which was controverted by other evidence. Further, it appears from the Tribe's argument that it believed "connection with family" was a reason envisioned under the Indian Child Exception. However, as previously discussed, reasons that may be compelling under the Indian Child Exception should relate somehow to the Indian child's membership in his or her Indian tribe and connection to the tribal community. In our view, a mere reference to "connection with family" will not suffice.

Even assuming the court should have interpreted the Tribe's argument regarding the children's placement to be a claim that termination and adoption by the current caregivers would interfere substantially with the children's connection to their tribal community, we nonetheless conclude the court did not abuse its discretion. Neither appellant introduced any evidence to support such a claim. Instead, they argue there was no evidence the current caregivers took steps to promote the children's connection to the tribal community. In making this argument, appellants lose sight that it was their evidentiary burden to establish that parental rights termination would interfere substantially with the children's connection to the tribal community. (See *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 [92 Cal.Rptr.2d 20] [it is burden of proponent of exception to adoption to show that termination would be detrimental].) The mere absence of evidence on that point does not prove appellants' argument.

This brings us to appellants' remaining argument that termination of parental rights would not be in the children's best interests because the Tribe identified guardianship as the appropriate permanent plan. The problem with this argument is twofold: One, the Tribe also identified adoption as the

children's plan, provided their former relative caregivers could be the adoptive parents; and two, although guardianship may have served the Tribe's interests, the court, in assessing the children's best interests, was not compelled to agree with the Tribe.

 In light of the Tribe's identification of adoption as well as guardianship as appropriate permanent plans for the children, the court may well have questioned the Tribe's rationale that, according to its custom and practice, parental rights should never be terminated. In addition, Indian children or not, the children had a fundamental interest in stability and permanency. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [33 Cal.Rptr.2d 85, 878 P.2d 1297] (*Jasmon O.*).) Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker. (*Celine R., supra,* 31 Cal.4th at p. 53.) Guardianship, while a more stable placement than foster care, is not irrevocable and falls short of the secure and permanent future the Legislature had in mind for a dependent child. (*Ibid.*) The Tribe's earlier role in bringing the children's relative placement to a premature close and current request to change their placement yet again, notwithstanding the undisputed evidence of the children's attachment problems, may similarly have persuaded the court that the Tribe's identification of guardianship did not coincide with the children's interest in stability and permanence. Under these circumstances, the court could conclude that the Tribe's identification of guardianship as a permanent plan for the children was not a compelling reason for finding that termination would be detrimental.

 Finally, appellants have joined the concept of adoption by the current caregivers with termination of parental rights in arguing detriment. In other words, they do not claim termination of parental rights, standing alone, would be detrimental to the children's best interests. To the contrary, the Tribe supported termination if the children's former relative caregivers could adopt them. Instead, appellants urge that termination of parental rights *and* adoption by the current caregivers would not be in the children's best interests. However, the court's focus at a section 366.26 hearing is not upon who will adopt a dependent child but rather whether the child is likely to be adopted if rights are terminated. (§ 366.26, subd. (c)(1).) If so, the court must terminate parental rights unless the court finds a compelling reason, pursuant to statute, for determining that termination of parental rights would be detrimental. (*Ibid.*) We question but need not resolve here whether appellants may properly join the issue of termination with the question of who will adopt given the statutory scheme.

*IV. Placement*

Regardless of which permanent plan the trial court selected, the Tribe argued before the trial court that it should defer to the Tribe's placement

preference and place the children once again with their former relative caregivers. Since the court did not agree with the Tribe's preference, appellants contend the court erred.

As mentioned earlier, the court was uncertain whether compliance with Indian child placement preferences must be evaluated as of when the children were placed with the current caregivers or when the court was selecting the permanent plan. If it was the former, the court found the agency did comply. If, on the other hand, the placement preference must be complied with at the time of the permanency hearing, the court found the preference had not been met but that good cause existed for their noncompliance. Appellants challenge the court's good-cause determination for insufficient evidence. (*Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 644–646 [19 Cal.Rptr.3d 155] (*Fresno County*) [appellate court applies substantial evidence standard of review to trial court's good-cause finding to overcome ICWA's placement preference].)

 California's placement-preference law for Indian children is contained in section 361.31.[10] In large part, it restates the ICWA provision in 25 United States Code section 1915 which mandates that preference in any adoptive placement of an Indian child be given, in the absence of good cause to the contrary, a placement with (1) a member of the child's extended family; (2) other members of the child's tribe; and (3) other Indian families. (25 U.S.C. § 1915(a); see Welf. & Inst. Code, § 361.31, subds. (c), (h).) Also,

---

[10] Section 361.31 provides:

"(a) In any case in which an Indian child is removed from the physical custody of his or her parents or Indian custodian pursuant to Section 361, the child's placement shall comply with this section.

"(b) Any foster care or guardianship placement of an Indian child, or any emergency removal of a child who is known to be, or there is reason to know that the child is, an Indian child shall be in the least restrictive setting which most approximates a family situation and in which the child's special needs, if any, may be met. The child shall also be placed within reasonable proximity to the child's home, taking into account any special needs of the child. Preference shall be given to the child's placement with one of the following, in descending priority order:

"(1) A member of the child's extended family, as defined in Section 1903 of [ICWA].

"(2) A foster home licensed, approved, or specified by the child's tribe.

"(3) An Indian foster home licensed or approved by an authorized non-Indian licensing authority.

"(4) An institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

"(c) In any adoptive placement of an Indian child, preference shall be given to a placement with one of the following, in descending priority order:

"(1) A member of the child's extended family, as defined in Section 1903 of [ICWA].

"(2) Other members of the child's tribe.

"(3) Another Indian family.

"(d) Notwithstanding the placement preferences listed in subdivisions (b) and (c), if a different order of placement preference is established by the child's tribe, the court or agency

the standards to be applied in meeting the placement preferences shall be the prevailing social and cultural standards of the Indian community where the parent or extended family resides or with which they maintain social and cultural ties. (25 U.S.C. § 1915(d); Welf. & Inst. Code, § 361.31, subd. (f).)

Section 361.31 also clarifies a number of points. First, preference shall be given to one of three preferred placements "in descending priority order." (§ 361.31, subd. (c).) Second, the court *may* determine that good cause exists not to follow the placement preference in accordance with subdivision (e) of section 361.31 which permits consideration, where appropriate, of the child's or parent's preference. (§ 361.31, subd. (h).) Third, a determination of the applicable prevailing social and cultural standards may be confirmed by the Tribe or by the testimony or other documented support of a qualified expert witness knowledgeable in the Tribe's social and cultural standards. (§ 361.31, subd. (f).) Fourth, section 361.31, subdivision (j), adopts one of the rules established by this court in *Fresno County, supra,* 122 Cal.App.4th at page 633, that the party requesting the preferences not be followed bears the

effecting the placement shall follow the order of preference established by the tribe, so long as the placement is the least restrictive setting appropriate to the particular needs of the child as provided in subdivision (b).

"(e) Where appropriate, the placement preference of the Indian child, when of sufficient age, or parent shall be considered. In applying the preferences, a consenting parent's request for anonymity shall also be given weight by the court or agency effecting the placement.

"(f) The prevailing social and cultural standards of the Indian community in which the parent or extended family members of an Indian child reside, or with which the parent or extended family members maintain social and cultural ties, or the prevailing social and cultural standards of the Indian child's tribe shall be applied in meeting the placement preferences under this section. A determination of the applicable prevailing social and cultural standards may be confirmed by the Indian child's tribe or by the testimony or other documented support of a qualified expert witness, as defined in subdivision (c) of Section 224.6, who is knowledgeable regarding the social and cultural standards of the Indian child's tribe.

"(g) Any person or court involved in the placement of an Indian child shall use the services of the Indian child's tribe, whenever available through the tribe, in seeking to secure placement within the order of placement preference established in this section and in the supervision of the placement.

"(h) The court may determine that good cause exists not to follow placement preferences applicable under subdivision (b), (c), or (d) in accordance with subdivision (e).

"(i) When no preferred placement under subdivision (b), (c), or (d) is available, active efforts shall be made to place the child with a family committed to enabling the child to have extended family visitation and participation in the cultural and ceremonial events of the child's tribe.

"(j) The burden of establishing the existence of good cause not to follow placement preferences applicable under subdivision (b), (c), or (d) shall be on the party requesting that the preferences not be followed.

"(k) A record of each foster care placement or adoptive placement of an Indian child shall be maintained in perpetuity by the State Department of Social Services. The record shall document the active efforts to comply with the applicable order of preference specified in this section."

burden of establishing the existence of good cause. To date, there is no published case interpreting section 361.31.

In this case, there were two available preferential placements for the children as defined by section 361.31 and ICWA. One was with the current caregivers, as "[a]nother Indian family" for adoption purposes. (§ 361.31, subd. (c)(3).) The other was the former relative caregivers, as members of the children's extended family. (§ 361.31, subd. (c)(1).) What neither section 361.31 nor ICWA addresses is the issue this case poses, namely how a court should proceed at a termination hearing involving Indian children who are already in one preferential placement under section 361.31 when a Tribe asks to change that placement to another with greater priority.

We observe that, were this a non-Indian-child dependency matter, the court properly could refuse to consider a new relative placement request at a section 366.26 hearing. (§ 361.3, subd. (d).) Once a child has been removed from parental custody, the court shall reconsider relative placement "whenever a new placement of the child must be made." (§ 361.3, subd. (d).) In other words, it is when a child's placement needs to be changed, regardless of a relative-placement request, that the court should once again give consideration to relatives. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032 [111 Cal.Rptr.2d 243].) This approach acknowledges the child's need for a stable placement.

At oral argument, appellants claimed there was a need to change the children's placement because the children's behavior worsened while in the current caregivers' home. The record does not support appellants' claim that the children's circumstances had changed for the worse so as to warrant their removal and reconsideration of a relative placement. Instead, the record establishes that the children's behavior, as well as their emotional well-being, had improved, albeit slowly, while in the current caregivers' home.

Consequently, the issue remains, because this was an Indian child dependency matter, how the court should proceed given that the children were in a preferential placement under ICWA and section 361.31 and, but for the Tribe's new placement preference, there was no reason to change the children's placement. Since ICWA and section 361.31 are arguably silent on the point and, given the children's fundamental interest in stability and permanency (*Jasmon O., supra*, 8 Cal.4th at p. 419), could the court properly rely on section 361.3, subdivision (d), and determine that a new placement was not necessary and conclude that section 361.31 had been satisfied? Or do ICWA and section 361.31 confer such deference to tribal preference that the court should consider placement anew at the section 366.26 hearing regardless of the children's current placement in an ICWA-preferred home?

Here, the court wisely approached the issue with alternative analyses. Appellants ignore the court's alternative approach in their briefs to this court. Since the parties did not brief this issue, we cannot resolve the issue here. Even so, we deem it appropriate to point out the issue for the Legislature's and other courts' future consideration.

Assuming, for the sake of argument, the Tribe's stated preference was entitled to the court's consideration · at the section 366.26 hearing, the question remains whether there was substantial evidence to support the court's good-cause finding not to place the children with their former relative caregivers. Appellants see the issue as largely a "blame game" regarding the circumstances surrounding the children's removal from their relatives' care eight months earlier. At oral argument, for instance, appellants argued that the court held the children's removal against the Tribe and instead should have deemed the agency to be at least partially responsible. According to appellants, the former relative caregivers in 2007 simply voiced a desire not to adopt rather than a request to remove and, therefore, the agency was wrong for not discussing with them legal guardianship as an alternative to adoption. The record supports neither of appellants' claims. The court did not assess blame in resolving the placement issue. Also, the record is uncontroverted that the former relative caregivers did ask the agency to remove the children. In addition, the placement issue was not a "compare and contrast" struggle between the two preferential placements.

Rather, there was opinion evidence from the Synchrony staff that "every effort [be] made to keep [the children's] home environment consistent" due to their attachment disorders. "Moving these girls would reinforce their negative inner pattern of relating to self and others, exacerbating their attachment disorders, significantly decreasing the chance of recovery and healing." The ICWA expert similarly observed that, because the children had experienced multiple placements, they had not had a consistent relationship where they could develop and, consequently, they suffered from attachment disorders. The court properly could infer from this evidence that to change their placement once again for preferential placement of a higher priority under section 361.31, subdivision (c), would be detrimental to their extraordinary emotional needs, and there was good cause not to follow the Tribe's stated preference. (See Cal. Rules of Court, rule 5.484(b)(2).)

To the extent appellants complain there was insufficient evidence that the former relative caregivers were unable to meet the children's emotional needs, appellants miss the point. First, *any* move from the children's current home posed a serious risk of harm. As a result, the agency established good cause not to follow the Tribe's stated preference at the section 366.26 hearing. (§ 361.31, subd. (h).) Due to the fact that any move posed a serious

risk of harm to the children, the agency did not have to establish additionally, as appellants argue, that the former relative caregivers were unable to meet the children's extraordinary needs. At that juncture, the Tribe could have, but did not, introduce any evidence that a return to the former relative caregivers' home would not have been detrimental.

In addition, appellants overlook the agency's evidence that at least one of the reasons the former relative caregivers gave for requesting the children's removal was that the wife, in particular, decided she could not commit to the long-term care of the children regarding their attachment disorder issues and their developmental needs. It is not up to this court to reweigh the evidence on review, as appellants would have us do. (*Laura F., supra*, 33 Cal.3d at p. 833.) Issues of fact are matters for the trial court alone. (*In re Amy M.* (1991) 232 Cal.App.3d 849, 859–860 [83 Cal.Rptr. 788].)

Further, we see no merit in appellants' argument that the court erroneously failed to consider the mother's wishes in reaching its good cause finding. Section 361.31, subdivision (e), authorizes a court to consider an Indian parent's placement preference where appropriate. Although in 2005 she recommended the relatives for placement, there was no current evidence of the mother's preference. She did not attend, let alone testify at, the section 366.26 hearing. At most, there was her statement in her acknowledgement of notice that she was opposed to termination of her rights. Also, given her lack of involvement in the children's lives, the court properly could have concluded that this was not an appropriate case, even assuming she agreed with the Tribe, to consider the mother's wishes.

Under all of these circumstances, we conclude the court's good-cause finding was supported by substantial evidence. (*Brison C., supra*, 81 Cal.App.4th at pp. 1378–1379.)

*V. Sibling visitation*

Appellants contend the court abused its discretion by not ordering visitation between the children and their sibling whom the former relative caregivers adopted. Notably, none of the parties asked the court to make such an order at the section 366.26 hearing. At most, there was Mr. G.'s expressed desire for future sibling contact in his declaration. We refrain from holding the court accountable to that desire in the absence of a request for an order which could have been, but was not, litigated. (*In re Lorenzo C., supra*, 54 Cal.App.4th at p. 1339.) Since the children's dependency remains ongoing following our affirmance of the termination order, the Tribe may pursue this issue with the agency and the trial court.

## *DISPOSITION*

Respondent's request for judicial notice is denied. The trial court's decision is affirmed.

Levy, J., and Dawson, J., concurred.

A petition for a rehearing was denied November 21, 2008, and the opinion was modified to read as printed above.