[No. G026904. Fourth Dist., Div. Three. June 26, 2000.]

LETITIA V. et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties
in Interest.

**COUNSEL**

Carl C. Holmes, Public Defender, Marri Derby and Paul T. DeQuattro, Deputy Public Defenders, for Petitioner Letitia V.

California Indian Legal Services, James F. Zahradka II, Laura Y. Miranda, and Lisa C. Oshiro for Petitioner Pechanga Band of Luiseño Mission Indians.

No appearance for Respondent.

Laurence M. Watson, County Counsel, and Rachel M. Bavis, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme, Harold F. LaFlamme and Craig E. Arthur for Real Party in Interest Levi V.

**OPINION**

**BEDSWORTH, J.**—Letitia V. and the Pechanga Band of Luiseño Mission Indians (the Tribe) seek extraordinary relief from an order of the juvenile

court denying reunification services and setting a permanency hearing under Welfare and Institutions Code (all subsequent statutory references are to this code) section 366.26 with regard to her nine-month-old son, Levi V. Petitioners claim the court's order is based on California law which conflicts with and is preempted by section 1912(d) of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and that "active efforts" within the meaning of the ICWA were not made to prevent the severance of Letitia's relationship with her son. We find no conflict between relevant state and federal law and conclude active efforts were made within the meaning of the ICWA to prevent the breakup of Letitia's family. We therefore deny the petition for a writ of mandate.

In September 1999, Levi entered the world—and the juvenile dependency system—under the influence of cocaine. He was immediately taken into protective custody by the Orange County Social Services Agency (SSA). His mother, Letitia, had a long history of substance abuse—and a long history with SSA.

SSA first became involved with her in 1993, when it received a child abuse registry (CAR) referral indicating she was using methamphetamine and leaving her then two-year-old daughter, Lindsey, unattended. Although SSA was unable to substantiate the allegations, they received two similar CAR's in February 1996. The first alleged Letitia's 13-month-old daughter, Brittany, was left unsupervised and, as a result, sustained second and third degree burns on her hands. The second indicated Letitia was heavily involved with drugs, kept a filthy home, and failed to provide basic care for her two daughters, both of whom she reportedly physically abused.

During SSA's investigation, Letitia claimed she had turned on her kitchen broiler while Brittany was in her crib, and then her cousin picked Brittany up and left her where she could toddle past chairs blocking the kitchen entryway. Letitia admitted using cocaine and "speed," but insisted she had been clean for two years and did not use narcotics during her pregnancies. She told the investigating social worker she had a history of molestation, was taking Paxil for depression, and felt she could benefit from counseling. After providing Letitia referrals for counseling, SSA took no further action.

In May 1996, however, SSA received a fourth CAR referral alleging that someone had burned Lindsey's back with a cigarette and that Letitia was smoking marijuana and using other drugs in the presence of her children. Again, Letitia denied the allegations, saying Lindsey's back had been injured at school. When the social worker returned to Letitia's home in June, he was informed Letitia and Paul G., Brittany's father, had been arrested for fighting

while Brittany was standing between them. After being contacted, Letitia agreed to accept informal family maintenance services, indicating she wanted counseling and a restraining order against Paul, and SSA developed a case plan.

During the period of informal supervision, Letitia's children appeared to be in good health, attended school regularly, and showed no signs of abuse. But Letitia refused to attend the counseling she had asked for, claiming it would not be of any benefit to her. Consequently, SSA closed its case on October 29, 1996. But that was not the end of its contact with Letitia.

In January 1997, SSA received a fifth CAR referral indicating Letitia was heavily involved in drugs, providing no care for her children, and leaving her house in "shambles," with food and empty bottles scattered on the floor and drug paraphernalia accessible in the back room. This time, when SSA investigated, it found the house dirty and cluttered, with doors broken from their hinges, and Letitia sleeping the day away in a darkened bedroom. Lindsey, who had special educational needs, was not in school because Letitia was unable to get out of bed to take her. Informal services were, again, provided, but with no positive effect.

On February 18, 1997, a social worker contacted Lindsey's school and found she had not attended for the past seven days. She then spoke with the child's paternal grandparents, who reported Letitia had slept the day away on February 7, leaving Lindsey and her sister unsupervised. They had taken Brittany home with them and made sure Lindsey was fed. Then, on February 20, 1997, a social worker dropped by Letitia's house accompanied by a police officer. Letitia, who appeared nervous, admitted snorting two lines of cocaine an hour before, while Lindsey was in the bathtub. She was arrested, and Lindsey was taken into protective custody by SSA, which immediately filed a petition under section 300, subdivision (b).

On March 26, 1997, Letitia pled no contest to the petition, and Lindsey was declared a dependent child of the court and placed in SSA's custody. Letitia was ordered to participate in a drug treatment program, Narcotics Anonymous, parenting classes, and counseling. But during the ensuing 12 months, she made virtually no progress with her service plan. She failed to keep SSA advised of her whereabouts and was discharged from the La Vista Recovery Program, which provided inpatient drug counseling, for breaching her treatment contract.

In July 1997, SSA provided Letitia with numerous referrals for additional help and by September 12, she had been admitted to Cedar House, a drug

rehabilitation center. A month later, she enrolled in a perinatal treatment program but, according to her substance abuse counselor, she did not do well there. She failed to report for drug tests, though she admitted problems with alcohol, and never showed up for counseling appointments. Despite these tribulations, SSA did not give up on Letitia. Her social worker encouraged her to meet with her counselor and, on January 12, 1998, she signed a contract with him, began attending group counseling sessions, and submitted to drug testing. SSA also referred her to another individual therapist, but after attending only one appointment, Letitia missed the next three scheduled dates, and therapy was terminated.

In February 1998, Letitia was admitted to Casa Elena, another in-patient drug treatment program but left after only two days. Her counselor opined that she "was coming off her high and couldn't handle it." Four days later, her social worker met with her and was told she would be returning to the La Vista Recovery Program. But she never did. Instead, Letitia disappeared and failed to appear on March 23, 1998, at Lindsey's 12-month review. After having provided services to Letitia for a year, the court terminated reunification services, finding she had failed to comply with her service plan. The court then scheduled a permanency hearing under section 366.26 and continued the proceeding several times to give notice to Lindsey's alleged fathers.

During the next nine months, Letitia's situation deteriorated. She visited Lindsey only sporadically, and she continued to use illegal drugs, ignored her doctor's orders, and eschewed prenatal care. In October 1998, she gave birth to twin girls, Cassandra and Cecilia. Both were born prematurely, weighing only three pounds nine ounces, and each had cocaine in her system. Consequently, on November 18, 1998, the juvenile court sustained petitions with regard to the twins under section 300, subdivisions (a), (b), and (j) and declared them dependents of the court. The court denied services to Letitia pursuant to section 361.5, subdivision (b)(12), and placed the girls with their paternal grandmother.

On January 5, 1999, the court held a section 366.26 hearing with regard to Lindsey. Letitia failed to appear, her parental rights were terminated, and Lindsey was freed for adoption. And in April 1999, the twins, too, were freed for adoption. Five months later, Letitia was again arrested for using cocaine, and four days later, Levi was born and immediately detained by SSA. The Tribe then filed a "Notice of Intervention" and requested copies of Levi's files. On October 19, 1999, the court granted the Tribe's request for intervention and disclosure. Meanwhile, SSA placed Levi with his maternal cousin, Patricia R., where he adjusted well. The assigned social worker

consulted with an attorney for the Tribe and was advised the Tribe was pleased with the placement choice.

During the following month, the social worker made several attempts to meet with Letitia, but his attempts were unsuccessful. He was able to speak with Levi's alleged father, however, and learned that he and Letitia had spent *a month* smoking crack cocaine together earlier in the year. Finally, on November 8, 1999, the social worker filed a pretrial report which recommended that reunification services not be offered to Letitia because section 361.5, subdivision (b)(10)[1] and (12)[2] applied. Thereafter, Letitia failed to appear for the scheduled pretrial and, one week later, was arrested for being under the influence of a controlled substance and two probation violations—leading to a jail sentence of 120 days.

On November 30, 1999, trial was postponed to January 18, 2000, in order to have Levi's presumed father by marriage transported to court. The court further ordered the Tribe to file a brief on the applicability of the ICWA. When the jurisdictional hearing was finally held on February 7, 2000, Letitia appeared and pled no contest to the petition. A dispositional hearing was then scheduled for February 28. On that date, the court studied the Tribe's brief regarding the ICWA along with a similar brief prepared by Levi's counsel and considered whether active efforts had been employed in an effort to prevent the breakup of the Indian family.

After argument, the court concluded the ICWA applied but that there was "not a conflict [between it and] state law." Further, the court heard from the social worker, who testified that the social worker working with Letitia in connection with Lindsey was well aware she was a member of the Pechanga Band. Testifying as an expert, he explained that, during the prior period of supervision, SSA had utilized resources as required by the ICWA, placing Letitia's children with relatives. Although he was not certain whether any of the services offered had been specifically geared toward Indian culture, he observed that the Tribe had referred Letitia to the La Vista Recovery Program, which she attended—albeit briefly.

Due to Letitia's continued involvement with dangerous drugs, the social worker stated that placing Levi with his mother would risk substantial

---

[1]Section 361.5, subdivision (b)(10) indicates that reunification services need not be furnished to a parent who failed to reunite with the minor's sibling (or half sibling) after the sibling was removed from the home if the parent has also failed to take reasonable steps to treat the problem which led to the sibling's removal.

[2]With certain qualifications, section 361.5, subdivision (b)(12) provides that reunification services need not be extended to a parent who has "a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior treatment . . . ."

detriment to the child. He noted that SSA had repeatedly tried to work with Letitia, to encourage a relationship between her and Lindsey, and to provide referrals for drug treatment, parenting, and psychiatric help, but Letitia continually failed to follow through. Despite receiving a full year of services for Lindsey, Letitia failed to complete even a single drug treatment program. So the social worker's opinion was that returning Levi to his mother's care would place him at significant risk of physical and emotional harm.

After Letitia testified, the court reaffirmed its earlier finding that active efforts had been made to prevent the breakup of an Indian family, but found those efforts had repeatedly proved unsuccessful. It further found vesting custody with Levi's parents would be detrimental to him, and that reasonable efforts had been made to eliminate the need for his removal from their care. Finally, the court found section 361.5, subdivision (b)(10) and (12) applicable and declined to offer additional reunification services. It scheduled a permanency hearing under section 366.26 for June 27, 2000, and petitioners responded by filing timely notices of intent to file writ petitions as required by California Rules of Court, rule 39.1B, and the petitions before us now.

## DISCUSSION

Under California dependency law, "Reunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence . . . : [¶] . . . [¶] (10) That (A) the court ordered termination of reunification services for any siblings or half-siblings of the child because the parent . . . failed to reunify with the sibling or half-sibling after the sibling or half-sibling had been removed from that parent . . . or (B) the parental rights of a parent . . . over any sibling or half-sibling of the child had been permanently severed, and that, according to the findings of the court, this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that child from that parent . . . . [or] [¶] . . . [¶] (12) That the parent . . . has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior treatment for this problem during a three-year period immediately prior to the filing of the petition that brought [the] child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible." (§ 361.5, subd. (b)(10), (12).)

Thus, while California law strives to preserve or reunify families whenever possible, the Legislature has recognized "that it may be fruitless to

provide reunification services under certain circumstances." (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750 [50 Cal.Rptr.2d 858].) Petitioners contend this principle of state law is in conflict with the ICWA, which provides: "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d), italics added.)

Fully distilled, petitioners' arguments concern whether "active efforts" within the meaning of ICWA require reunification services be provided for each individual child or, put another way, whether the state is free to consider what it defines as recent but unsuccessful reunification efforts with the same parent but a different child sufficient to satisfy the mandate of 25 United States Code section 1912(d) with regard to a sibling. While the issue presented is evidently one of first impression in California, we find nothing particularly perplexing about it and nothing novel about the California Legislature's conclusion. The law does not require the performance of idle acts. (Civ. Code, § 3532.) And where substantial but unsuccessful efforts have just been made to address a parent's thoroughly entrenched drug problem in a juvenile dependency case involving one child, and the parent has shown no desire to change, duplicating those efforts in a second case involving another child—but the same parent—would be *nothing*[3] but an idle act.

The federal statute says nothing about requiring the state to provide duplicative reunification services. It simply requires that active efforts be made to prevent the breakup of Indian families. The phrase "active efforts," construed with common sense and syntax (*Rash v. Lungren* (1997) 59 Cal.App.4th 1233, 1236-1237 [69 Cal.Rptr.2d 700]), seems only to require that timely and affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designed to remedy problems which might lead to severance of the parent-child relationship. (Cf. *In re Michael G.* (1998) 63 Cal.App.4th 700, 713-715 [74 Cal.Rptr.2d 642]; *In re Crystal K.* (1990) 226 Cal.App.3d 655, 666-667 [276 Cal.Rptr. 619].[4]) This conclusion, which seems rather obvious to us, is consistent with holdings in sister jurisdictions.

---

[3]Nothing, that is, but an enormous expense and drain on a dependency system, which is already strained to the breaking point. (See *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1758 [53 Cal.Rptr.2d 687].)

[4]*In re Crystal K., supra,* 226 Cal.App.3d at page 667 explains that under 25 United States Code section 1912(d), "remedial efforts must be directed at remedying the basis for the parental termination proceeding . . . ." Here, the "basis" for the dependency proceeding with

For example, in *People in Interest of A.R.P.* (S.D. 1994) 519 N.W.2d 56, the mother had six children by several different fathers. After the state department of social services (DSS) removed them from her care, service plans were designed for her to follow, but none was ever completed. Her parental rights as to her first five children were terminated in 1989. When the sixth child was born in 1991, it was immediately taken into protective custody, based upon its parents' history. After a lengthy dispositional hearing, the court terminated parental rights without offering remedial services to prevent breakup of the family.

The parents appealed, claiming active efforts had not been made to prevent breakup of the family. The South Dakota Supreme Court disagreed, explaining: "Our review of the record shows that the DSS consistently attempted to provide a broad range of services to these parents. Noting that, 'these efforts and their futility must be shown . . . ,' we find that the record is more than ample to meet the requirements of the ICWA. [Citations.] [¶] . . . [T]he trial court properly reviewed the history of Mother and Father and the facts relating to the termination of parental rights as to their other . . . children." (*People in Interest of A.R.P., supra,* 519 N.W.2d at p. 60.) And in short, the court found the efforts made in the sibling cases were sufficient to justify the termination of parental rights without the provision of additional remedial services. (Cf. *A.A. v. State* (Alaska 1999) 982 P.2d 256, 262 [additional services not required where parent demonstrates "lack of commitment to treatment"]; *A.M. v. State* (Alaska 1997) 945 P.2d 296, 305 [in determining sufficiency of remedial efforts, court may consider a parent's demonstrated lack of willingness to participate in treatment]; *C.E.H. v. L.M.W.* (Mo.Ct.App. 1992) 837 S.W.2d 947, 957 [additional remedial programs not required where prior "efforts became futile and proved unsuccessful"]; *In re Annette P.* (Me. 1991) 589 A.2d 924, 928-929 [finding prior remedial efforts sufficient where parents failed to cooperate with case worker or demonstrate interest in reunification]; *State ex rel. Juv. Dept. v. Woodruff* (1991) 108 Or.App. 352 [816 P.2d 623] [additional services not required by ICWA where parents with long history of alcohol and drug abuse had received prior services]; *People in Interest of S. R.* (S.D. 1982) 323 N.W.2d 885, 887 [finding active efforts within the meaning of the ICWA after repeated but unsuccessful steps were taken to encourage the mother to take advantage of available treatment programs]; see also *People in Interest of P.B.* (S.D. 1985) 371 N.W.2d 366, 372 [opining that the state was not "charged with the duty of persisting in efforts that can only be destined for failure"].)

The only question remaining is whether, in this case, active efforts were made to prevent the breakup of Letitia's family. And that question, as we

regard to Levi was Letitia's ongoing problem with illegal substances. All of SSA's remedial efforts have been directed at remedying that very problem.

find ourselves saying with distressing frequency, " '. . . is not close.' " (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 25 [96 Cal.Rptr.2d 553].)

Letitia is, sad to say, a chronic abuser of illegal and dangerous drugs. Her history as a drug abuser is extensive. Her slavery to illegal substances is so complete that she is unable to exercise compassion for her unborn children— whom she has had no compunction about poisoning with alcohol, methamphetamine, marijuana, cocaine, and we know not what else.

We are unimpressed by petitioners' claims that SSA should have provided services more sensitive to Letitia's Indian culture. They fail to identify what other services might have been available to deal with Letitia's substance abuse problem, and we are not ourselves aware of any services which might have been more effective or otherwise superior to those which she received from the social workers assigned by SSA. What more could they have done than to refer her to a program recommended by the Tribe?

SSA has spent *years* trying to encourage Letitia to see a drug program through. Its workers have provided her referral after referral. And their plethora of efforts has been entirely unsuccessful. She has had a solid year of reunification services, not to mention years of informal services, to aid her in preventing the breakup of her family. But despite losing her children seriatim she has been unable to break the destructive cycle she began at least eight years ago. Her lack of resolution cannot be blamed on SSA. And the court cannot be faulted under either state or federal law for choosing not to expend resources which merely duplicate efforts that have already been made.

The petition for a writ of mandate is denied.

Sills, P. J., and Crosby, J., concurred.