Filed 6/19/14  In re A.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

<table>
<tr><td>

In re A.C., a Person Coming Under the Juvenile Court Law.

RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,

    Plaintiff and Respondent,

v.

A.C. et al.,

    Defendants and Appellants.

</td><td>

E059633

(Super.Ct.No. RIJ116058)

OPINION

</td></tr>
</table>

APPEAL from the Superior Court of Riverside County.  Tamara L. Wagner, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant A.C.

Brent D. Riggs, under appointment by the Court of Appeal, for Defendant and Appellant B.P.

1

Pamela J. Walls, County Counsel, Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

Defendants and appellants B.P. (Mother) and A.C. (Father) appeal the termination of their parental rights under Welfare and Institutions Code section 366.26[1] as to their minor daughter A.C. (Minor). Although they have filed independently, they join in each other's briefs. Mother contends the juvenile court erred in not awarding custody to Father, in terminating parental rights without making a finding that there were active efforts made to provide reunification services, and in failing to find a parental bond existed between Mother and Minor. Father asserts that the denial of his modification petition following his release from prison was an abuse of discretion. Because we find the juvenile court's rulings correct and supported by the record, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

A.    FAMILY HISTORY

Minor is the only child of both Mother and Father. They are not married, and each has had children with other partners. Mother is a member of a federally recognized Indian tribe. Mother's other children, A.A.J., A.M.A. and D.A. have been subject to dependency actions. Mother had previously tested positive for methamphetamine when she delivered A.M.A. in 2005. In March 2008, a section 300

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

petition was filed on behalf of A.A.J., A.M.A., and D.A., because Mother and D.A., had tested positive for methamphetamine. Mother had at that time a criminal record, which included three drug-related misdemeanor convictions and felony convictions for burglary and theft of public services.

Although a protective custody warrant was issued on March 13 for the children, A.A.J. and A.M.A. could not be located and it was believed that their father had absconded with them. At a Jurisdiction/Disposition hearing on April 7, D.A. was placed in out-of-home care and Mother was given family reunification services. The absent father was denied services.

In February 2009, while mother was receiving services, she delivered another child, A.H.A. When Mother informed her social worker of the birth, a section 300 petition was opened on A.H.A. Although Mother was progressing in her drug abuse treatment, she was residing in a home with adults with criminal records. On February 27, A.H.A. was removed from Mother's custody. She was continued in reunification services, and D.A. and A.H.A. were returned to her care on November 12. A.A.J. and A.M.A. were not located and that matter was dismissed.[2] Mother completed her case plan and the dependency was terminated as to A.H.A. and D.A. on May 10, 2010.

Mother was the subject of a substantiated general neglect referral on January 23, 2011. It was reported that she was receiving public assistance from two counties for children not in her care and that she tested positive for methamphetamine after

---

[2] It appeared that as of November 15, 2011, A.A.J. and A.M.A. were residing with M.A., their paternal grandmother (PGM).

unsuccessfully trying to dilute her test sample. Subsequently, Mother was arrested on felony possession charges on November 17, 2011, which resulted in a misdemeanor conviction. As part of her probation, she was to provide her probation officer with proof of enrollment into a substance abuse program by December 23, 2011. Mother had violated probation for a prior conviction in 2010 by failing a drug test, but had been diverted to a drug abuse program for pregnant women.

Father was involved in a dependency action concerning three children he had with another partner. On September 23, 2004, a section 300 petition was filed following an incident of domestic violence that was witnessed by his children. In addition, it was alleged that their mother had tested positive for methamphetamine and was not accepting treatment. The children were placed with their mother, and Father was given family maintenance and reunification services. Father's participation was unsatisfactory and he subsequently became incarcerated. The dependency terminated on May 11, 2006, with custody returned to the children's mother.

Father had felony convictions for domestic violence and dissuading a witness. He also had two felony convictions for possession of drugs. One was in 2004, and the most recent was entered on July 30, 2010.

B. MINOR

Minor was born in September 2011. A general neglect referral was made on November 9 following Mother's positive test for methamphetamine and her admission that she been using when she was pregnant. Mother admitted current drug use, but considered herself a "casual" methamphetamine user. The investigating social worker

4

considered Mother's answers evasive and less than honest. Mother admitted that she had recently been in prison, but claimed she didn't know why or when. She stated that Father was in prison "because of drugs," and would be out in two or three years.

The social worker observed that Minor had the movements and physical characteristics of drug-exposed infants. It appeared that Minor was accustomed to being fed via breast and not by bottle. She was taken to Riverside County Regional Medical Center where it was determined the infant was experiencing drug withdrawal symptoms.

Defendant and respondent Riverside County Department of Public Social Services (the Department) filed a section 300 petition on November 14, which was granted on November 15. Minor was initially placed in a foster home and shortly afterward moved to the care of PGM.

A Jurisdiction/Disposition report was filed on December 29, 2011. The report disclosed that Father told a social worker he planned to overcome his drug habit and he wanted to care for Minor upon his release from prison. He said he was wait-listed for drug treatment in prison; he had never before been eligible for substance abuse treatments because this was his first drug-related conviction. He told the social worker he had previously taken parenting, Alcoholics Anonymous, and gang diversion classes.

When interviewed for the report, Mother denied ever breastfeeding Minor. PGM reported that Mother telephoned to set up a visit with the children for the next day, but did not show. PGM told the social worker Father had "'struggled'" with methamphetamine use. She admitted she did not know much about Mother and that

Mother was not very forthcoming with her, but that Father called her weekly from prison. She stated Mother was always very attentive and appropriate with Minor and that Mother seemed to have bonded to the child. She reported Mother had a number of pleasant visits with Minor, including one on Christmas Eve, and that Mother was saddened when told how well Minor had bonded with her paternal grandparents.

The foster parents who had cared for Minor before her placement with PGM reported that they thought Mother had been denied visitation because she had made no attempt to arrange a visit.

The report included a statement from a TANF (Temporary Assistance for Needy Families) official who stated that Mother had requested shelter, cash, and hotel voucher aid, but she was now barred from receiving hotel vouchers because she had twice been ejected by police due to her violating the terms of housing by lodging multiple unrelated people in her room and by having "multiple people" coming and going late at night. In addition, Mother did not comply with the program's drug testing requirements.

In a section describing the services provided to the family, the report noted Mother had previously received services as part of the 2006 dependency. The social worker reported a meeting with Mother in December 2011 to discuss available services. At that meeting, Mother stated she was going to enroll in a substance abuse program as part of her probation. She agreed to take a drug test, but failed to test, and did not provide proof of enrollment in an abuse program. Father was likewise sent information regarding services, but, given the length of his prison term and the child's age, he was told that adoption or legal guardianship was the expected plan. He expressed

6

disappointment and said he did not wish to give up his parental rights. Mother, likewise, objected to the loss of her parental rights.

On January 4, 2012, the juvenile court sustained the petition, declared Minor a dependent, and ordered her removed from her parents' custody. Services to Mother and Father were bypassed pursuant to section 361.5, subdivisions (b)(13) and (e)(1), respectively.

The Seminole Nation of Oklahoma was contacted on February 27, 2012, to register Minor as a member prior to her adoption. Minor was registered as a tribal member on September 13, 2012, and enrolled on October 11, 2012. The Seminole Nation assented on October 16, 2012, to the planned adoption by PGM. While matters were on hold for resolution of the tribal issues, Mother was arrested for felony theft on July 23, 2012. During her time in jail, Mother's twice-weekly visits with Minor were discontinued, and she had only two visits with her thereafter. Father was released from jail on August 8, 2013. The Seminole Nation denied a request for tribal customary adoption on March 28, 2013, removing the hold on further proceedings.

C.     PROCEEDINGS

In advance of the September 13, 2013, section 366.26 Selection and Implementation hearing, a number of documents were filed. The Department filed a Court Addendum report on December 28, 2012, which included an expert declaration by Phillip Powers (Powers). Powers holds a Masters degree in Psychological counseling, and was a former CPS social worker who worked 12 years for the Indian Specialty Unit formed by San Diego County for the implementation of the Indian Child

7

Welfare Act (ICWA). He was also a member of the Cherokee Nation of Oklahoma. He reviewed the case files and interviewed persons connected with the case to draft his declaration, although both Mother and Father were unavailable to him. He noted Mother failed to show up for drug testing, and she had failed to show proof of enrollment in a drug abuse program as required by her 2011 possession conviction. In his expert opinion, Minor's return to either parent would cause danger of severe physical and emotional harm. He also declared, "Active Efforts to prevent the breakup of an Indian family were made by [the Department] in this case."

The Department filed a subsequent Postpermanency Status Review report on March 21, 2013, which incorporated those views. The report stated that Minor was at "a very high risk of abuse or neglect" if the dependency were terminated and that "neither parent has addressed the issues that brought the child to the Court's attention." Following the denial of the request for tribal customary adoption, the Department filed further Court Addendum reports on July 3, 2013, and September 3, 2013, reiterating the risk to Minor, the appropriateness of her adoption by PGM, and the necessity of terminating parental rights.

Father filed a JV-180 Request to Change Court Order on September 6, 2013, which asked the court to place Minor with him and terminate the dependency, place her with him on family maintenance, or provide him with family reunification services. Father stated he had been released from prison, had signed up for three reformative classes, and had been clean and sober over two years. In addition, he cited that he had a strong bond with Minor, as he called her regularly, she recognized his voice, and called

8

him "Daddy." He has had "good" supervised visits with her where she was excited to see him and gives him hugs.

The request was heard at the September 9, 2013, section 366.26 hearing; the court found that active efforts were made and were unsuccessful, that adoption was likely, and that a basis existed for termination of parental rights. The court then ordered Mother's and Father's parental rights terminated and ordered Minor referred for adoption, with the current caretakers to be given preference. Regarding Father's petition, the court found his "circumstances are changing" but it could not "make a finding of changed circumstances." Father had requested services at the hearing on January 4, 2012, on the basis that he was determined to change his life and desired to participate in services. The court again denied services. Lastly, the court accepted a stipulation from the parties that expert witness Powers's declaration be accepted in lieu of testimony.

## DISCUSSION

Mother argues that the court should have granted custody to Father because there was not proof beyond a reasonable doubt that doing so would have harmed Minor, that there were no active efforts to reunify the family, and that there was a parental bond between Mother and Minor. Father asserts it was an abuse of discretion to deny his JV-180 petition. These contentions are unpersuasive; we affirm.

A.     CUSTODY

Mother questions the court's finding that returning Minor to Father's custody would expose Minor to risk of serious harm.

9

Termination of parental rights may not be ordered "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C.A. § 1912(f).) Likewise, Welfare and Institutions Code section 366.26, subdivision (c)(2)(B)(ii) requires "a determination at the hearing terminating parental rights, supported by evidence beyond a reasonable doubt, including testimony of one or more 'qualified expert witnesses' as defined in Section 224.6, that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child." Under Welfare and Institutions Code section 224.6, such qualified experts include "a social worker, sociologist, physician, psychologist, traditional tribal therapist and healer, tribal spiritual leader, tribal historian, or tribal elder, provided the individual is not an employee of the person or agency recommending foster care placement or termination of parental rights."

We review the court's ICWA detriment finding for supporting evidence that is reasonable, credible, and of solid value, and uphold the juvenile court's finding unless it can be said that no rational fact finder could reach the same conclusion. (*In re Barbara R.* (2006) 137 Cal.App.4th 941, 951.) Under this standard, we do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence to the contrary. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) The

10

appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Mother asserts the sole harm to which parental custody exposed Minor was the risk that she would be breastfed milk that was tainted by methamphetamine. Moving Minor to Father's care would have eliminated that risk, she argues, and Father would likely have put Minor into the same care where the Department eventually placed her. Mother states there was insufficient evidence for a finding beyond a reasonable doubt that Father's custody exposed Minor to any risk. Further, there was no finding by the court of such risk of harm.

Mother's argument limits the evidence regarding risk of harm to the statements by a Department social worker regarding Minor's withdrawal symptoms. The social worker's testimony does not stand alone. The specific charge is corroborated by Mother's admission of drug use. More broadly, the record itself discloses an extensive history of drug abuse, criminal activity, and reckless behavior by Mother. Since Mother is not arguing for her own custody of Minor, the court will consider whether Father's custody entailed any risk.

The record discloses that Father was previously part of a dependency action for three children he had with another partner. It was alleged there was drug use in the home and that domestic violence had taken place in front of the children. Father did not satisfactorily participate in the proffered maintenance and reunification services, and was incarcerated. Although Father's imprisonment records do not appear to be part of the record before this court, it is reasonable to assume he was incarcerated in connection

11

with the drug possession and domestic violence felonies to which he pled guilty in 2004. At the time of the institution of the dependency action, Father was in prison for another drug possession felony and admittedly had been using methamphetamine. Mother assumes Father would have made a safe placement for Minor had she been put in his indirect care, but the record of his judgment is not reassuring.

Further, the court took testimony from Powers, an expert qualified under multiple aspects of section 224.6. He conducted a thorough assessment, including direct interviews of persons knowledgeable about the matter, and found that Minor's return to either parent would cause danger of severe physical and emotional harm. This expert opinion, combined with the facts in the record concerning Father's felony convictions, drug use, and prior family issues, is sufficient evidence to justify the court's finding beyond a reasonable doubt that the continued custody of Minor by Father was likely to result in serious emotional or physical damage to the child.

Mother asserts no such finding was made and that we may not infer one. (*In re Abram L.* (2013) 219 Cal.App.4th 452, 462-463.) The court did find, "[a] sufficient basis for termination of parental rights exists," which must mean that the court found a risk of serious harm. That finding, and the record before this court, is a basis for us to imply an explicit finding. There is no bar to such a finding; *Abram L.* holds only that such findings may not be presumed when it appears from the record that the juvenile court failed to consider the correct statute. (*Id*. at p. 462.) As noted in that case, we may imply such a finding when, as here, the evidence is clear and substantial. (*Id*. at p. 463, fn. 5; *In re Corinna G* (1989) 213 Cal.App.3d 73, 83-84.)

B.     ACTIVE EFFORTS

Mother argues the denial of reunification services to her and Father violates the requirement under ICWA that active efforts be made to prevent the breakup of an Indian family.

"Whether active efforts were made is a mixed question of law and fact. [Citation.]  We can determine what services were provided by reference to the record. Whether those services constituted 'active efforts' within the meaning of section 361.7 is a question of law which we decide independently.  [Citation.]"  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1286 (*K.B.*).)  As noted above, we review ICWA findings for supporting evidence that is reasonable, credible, and of solid value.

An agency seeking termination of parental rights to an Indian child "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."  (25 U.S.C. § 1912, subd. (d); see also §§ 366.26, subd. (c)(2)(B)(i), 361.7.)  The phrase "active efforts" means that "timely and affirmative steps be taken to accomplish the goal which Congress has set:  to avoid the breakup of Indian families *whenever possible* by providing services designed to remedy problems which might lead to severance of the parent-child relationship." (*Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016 (*Letitia V.*) italics added; see also *K.B.*, *supra*, 173 Cal.App.4th at p. 1284.)

There is no established formula for distinguishing between active and passive efforts. (*K.B.*, *supra*, 173 Cal.App.4th at p. 1287.) "However, the following is a useful guideline: 'Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, [ICWA] would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.' [Citation.]" (*Id.* at p. 1287.) "Although the phrase 'active efforts' is not defined by either federal or state statute, California courts have construed 'active efforts' to be 'essentially equivalent to reasonable efforts to provide or offer reunification services in a non-ICWA case . . . .' [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 134.) The law requires a reasonable effort be made to reunify an Indian family whenever it is possible that such efforts will succeed.

Both Mother and Father were contacted by social workers at the beginning of the dependency action. As an initial matter, Mother met with a social worker who provided a family assistance package to her and reviewed it with her. Further steps were not taken with Mother because she made herself difficult to contact, failed to comply with drug testing requirements and continued drug use, and was arrested on felony theft charges. Father was interviewed in custody, but was informed he would not be offered reunification services because of the child's age and the length of his imprisonment.

14

The social workers had reason to suspect Mother and Father were less than honest and forthcoming with them. Father's imprisonment and Mother's subsequent confinement put an effective end to the efforts to reunify the family.

Both Mother and Father were denied reunification services at the 2012 Jurisdictional hearing. Mother's services were denied under section 361.5, subdivision (b)(13), which states services may be denied where "the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible." Father was denied services under section 361.5, subdivision (e)(1), which allows denial of services to incarcerated parents after consideration of "the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration, institutionalization, or detention within the reunification time limitations described in subdivision (a), and any other appropriate factors." Thereafter, at the Selection and Implementation hearing, the juvenile court, following the lead of the opinion of the expert witness, found sufficient active efforts had been made to reunify the family.

At worst, Mother argues, she failed during the relevant period to complete a criminal-court-ordered drug program for pregnant women and failed to provide proof that she enrolled in a substance abuse education program. Father, she contends, was denied services solely because he was imprisoned.

Mother argues that active efforts to provide services must be made even where the prospect of successful reunification is dim. She cites *In re Michael G* (1998) 63 Cal.App.4th 700, as authority requiring that services be provided unless they would be harmful to the minor. There, the mother was described as "'disturbed (and disturbing)'" and the father as a "'low intensity sociopath.'" (*Id*. at pp. 705-706.) The parents received "a plethora of services" that "proved markedly unsuccessful" until transfer of the case to the Navajo Nation caused services to end when the court lost track of the parents. (*Id*. at pp. 714-715.) The court's finding of "active efforts" was reversed because of the sudden termination of the reunification services. "[T]he 12-month statutory reunification period is not reduced simply because parents are not expected to comply or succeed." (*Ibid*.)

Further, section 361.7 requires provision of services to Indian families even where reunification services could be denied under section 361.5. Cases to the contrary, Mother argues, must be limited to their facts. (*K.B*., *supra*, 173 Cal.App.4th at p. 1279 [father was a child molester], *Letitia V*., *supra*, 81 Cal.App.4th at p. 1015 [active efforts attempted before mother's relapse].) Unless the provision of those services were an idle act, she contends, they are required under the law. Mother's reliance on the cited cases is misplaced.

16

The parents in *In re Michael G.*, *supra*, were performing poorly when the transfer of the case caused their services to stop abruptly. The facts that (1) the parents were not progressing, and (2) that their personalities made them unlikely to benefit was held to be insufficient reason to presume they did not have a right to complete the course of services that had been set for them. Both *K.B.* and *Letitia V.* countenanced the denial of services to an Indian family under similar circumstances. *K.B.*'s facts are not similar to the instant case, but *Letitia V.* has similarities. The mother there had a drug addiction, used drugs during pregnancy, and had been frequently in dependency court with other siblings because of drug use. The mother had been ordered to participate in a drug treatment plan, Narcotics Anonymous, parenting classes, and counseling, and was encouraged by her social worker to do so, but failed to follow through and ended her interaction with child services when she was jailed on drug charges. (*Letitia V.*, *supra*, 81 Cal.App.4th at pp. 1011-1014.) Mother's history is similar.

Mother had taken drugs through three pregnancies. She does not have custody of any of Minor's siblings. She has twice before been through dependency court because her drug addiction was more compelling than caring for her children. Although Mother successfully resolved one dependency through treatment, she relapsed into drug use less than a year later despite being responsible for the care of two infants. She violated her probation on a criminal charge by failing a drug test and was expelled from programs for refusing to test. She had a significant criminal history, was dishonest, and could not refrain from further criminal activity during the pendency of this action. Denial of reunification services is not a matter of prejudging her willingness or ability to comply

17

with the program; it is a matter of recognizing the futility of trying again. As noted in *Letitia V*, "the court cannot be faulted under either state or federal law for choosing not to expend resources which merely duplicate efforts that have already been made." (*Letitia V.*, *supra*, 81 Cal.App.4th at p. 1018.) Similarly, father's imprisonment was not the sole factor in denying him services. His previous failure to benefit from or complete services, his lack of candor, his violent criminal record, and the same destructive habit of drug abuse supports the court's view that it would be a pointless gesture to attempt to unify the family.

By meeting with the Mother and informing her of the services available, the Department began active efforts to provide reunification services to her. Mother's prior history and her current inability or unwillingness to conform to the expectations set before her, which culminated in another arrest, made further provision of services pointless. Similarly, Father's incarceration and his record in criminal and dependency cases justified the juvenile court deciding to deny services.

C.    PARENTAL BOND

Mother asserts that the court erred by not applying the parental bond exception to bar termination of her parental rights because of the strong bond that existed between her and Minor.

On appeal, we review the order terminating parental rights under a substantial evidence standard. (*In re Jasmon O*. (1994) 8 Cal.4th 398, 422-423.)[3] In doing so, we do not reweigh the evidence or exercise our independent judgment. Rather, we review the evidence in the light most favorable to the judgment and decide if the evidence in support of the judgment is reasonable, credible and of solid value such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. (*Ibid*.) Mother bears the burden of proving the beneficial relationship exception applies. (*In re Cristella C*. (1992) 6 Cal.App.4th 1363, 1372-1373.)

The beneficial parental relationship exception applies when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . . [Citation.]' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. [Citations.]" (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 953-954, quoting *In re Autumn H* (1994) 27 Cal.App.4th 567, 575.) "In other words, for the exception to apply, the emotional attachment between the child and parent must be that of parent and

---

[3] Some courts have applied an abuse of discretion standard. (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1351.) Under either standard Mother's contention fails.

child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt. [Citation.]" (*In re Angel B*. (2002) 97 Cal.App.4th 454, 468.)

In support of her claim, Mother notes that, although she only had custody of Minor for the first two years of Minor's life, Mother visited her frequently and mothered her during their regular twice-weekly visits, until Mother was again incarcerated in July of 2012. In response to the Department's rejoinder that Minor had bonded to PGM, Mother rejoins that there is no evidence in the record Minor was not bonded to Mother. That is not a sufficient response.

Minor was two months old when Mother's drug use required that Minor be placed in foster care. Mother visited Minor sporadically thereafter, perhaps achieving twice-weekly visits over a 10-month period. Since Mother's latest arrest, she has apparently seen Minor twice in the following 18 months. On this basis, Mother contends that she has carried her burden of proof. She has not. Mother may be bonded to the child, but that is not the test. Mother must show that Minor thinks of her as a parent and that she has acted as a parent to her. Finding no evidence in the record that Minor has an emotional attachment to Mother, we affirm the court's decision not to apply the parental bond exception.

D.     CHANGE OF CIRCUMSTANCES

Father asserts the juvenile court abused its discretion when it denied his section 388 petition to modify the order terminating his parental rights due to a change in circumstance.

20

Section 388 provides that the juvenile court may, in its discretion, modify a prior order on the request of any interested person, if the court finds both (1) new evidence or a material change in circumstances justifying modification of the order, and (2) that the requested modification would be in the child's best interests. (§ 388, subd. (a).) A person filing a section 388 petition has the burden to show by a preponderance of the evidence that there is new evidence or there are changed circumstances that make modification of a prior order in the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

When a party having the burden of proof on an issue challenges a finding that reflects the trier of fact's rejection of that party's evidence, "the question for a reviewing court becomes whether the evidence *compels* a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support [the] finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, italics added.) Stated another way, Father's challenge to the court's finding that no change in circumstance had occurred amounts to a contention that the "undisputed facts lead to only one conclusion." (*Id.* at p. 1529; see also *In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

As noted above, Father's prior history represented a major factor in considering whether to offer him reunification services while in prison. His incarcerated status was not the sole factor in denying services; as both Mother and Father noted, it could not be,

21

as there is no rule that prisoners must lose custody of their children.  Consequently, his release from prison did not solve all of the infirmities he suffered in seeking to retain custody.  Father had a violent criminal record, had failed to comply with a prior family reunification plan, and he had a serious drug problem.

Father can do nothing about his record except to not add to it.  Likewise, he cannot undo his previous family reunification failure.  He can, however, take positive steps now, and that is what he states he has done.  He claims he has been clean and sober for a significant period of time and has nearly completed treatment and a parenting class.  Further, Father argues it is significant that he has established some degree of bonding with Minor.  Minor recognizes his voice, calls him "Daddy," and they have pleasant interactions.  Although the inception of a parental bond is a good thing, these facts were before the juvenile court and do not establish changed circumstances.  Father has demonstrated positive intent and has begun to make positive changes in his life.

The juvenile court recognized Father's intent and acknowledged his circumstances were changing.  The juvenile court did not find that sufficient, nor can we.  The changes must be considered in light of a long-term addiction problem and the fact Father has been out of prison less than eight months.  When asked in 2011 about his plans for treatment, Father stated he had not taken treatment because he had not previously been arrested on drug related charges.  That statement must be weighed against Father's current profession of intent.  He states he has nearly completed some programs and will continue to stay sober.  While encouraging, these assurances do not

amount to unimpeached facts that lead to only one conclusion. As noted by Minor's counsel at the hearing, the petition is premature. The juvenile court's decision not to grant Father's section 388 petition was not an abuse of discretion.

## DISPOSITION

The judgments as to Mother and Father are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                          
                                                    J.

We concur:

RICHLI                          
                    Acting P. J.

KING                          
                                J.