Filed 4/22/25  J.T. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| J.T.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G065147<br><br>(Super. Ct. Nos. 23DP0904, 23DP0905)<br><br>O P I N I O N |

        Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Lindsey E. Martinez, Judge. Petition denied.

        Orange County Dependency Lawyers and Michael Haddad for Petitioner.

No appearance for Respondent.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

No appearances for Real Parties in Interest A.M., G.T., J.M., and the Yurok Tribe.

* * *

J.T. (Mother) seeks extraordinary writ relief from the juvenile court's order terminating her reunification services and setting a permanency planning hearing for her minor children, 16-year-old G.T. and 14-year-old J.M. (Cal. Rules of Court, rule 8.452.) She argues the Orange County Social Services Agency failed to make "active efforts" to reunify the family, as required in cases involving Indian children.[1] Because substantial evidence supports the court's finding that the Agency met its active-efforts obligation, we deny Mother's petition.

## FACTS

### I.

#### INITIAL PROCEEDINGS

The children resided in Orange County with their father while Mother, a member of the Yurok Tribe, resided in tribal housing in Humboldt County. The children were taken into protective custody in August 2023 due to the father's severe substance abuse issues.[2]

---

[1] "[W]e use the term 'Indian' throughout to reflect the statutory language" though many prefer other terms. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1.)

[2] The father does not challenge the juvenile court's order, and we do not further discuss his role.

2

The Agency filed a petition under Welfare and Institutions Code section 300 as to the children.[3] As to Mother, the petition alleged: "[Mother] has an unresolved problem with substance abuse which includes, but is not limited to, alcohol. . . . . [M]other's criminal history contains multiple substance-abuse-related offenses. . . . [T]he adult maternal half-sibling, [V.V.], reported that the mother had a long history with drugs and that the mother had lost custody of [V.V.] as a result. [V.V.] further reported that the mother continued to be an alcoholic." The children were detained from parental custody and placed with extended family members.

At the jurisdiction hearing, the juvenile court sustained the relevant allegations in the Agency's petition. At a January 2024 disposition hearing, the court declared the children dependents of the court and ordered them removed from the parents' custody. It ordered family reunification services for the parents. Mother's case plan included a substance abuse treatment program, random substance abuse testing, counseling, and parenting education. Mother was permitted to have supervised phone calls with the children.

During these proceedings, the juvenile court found that the federal Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) applied. The children were later enrolled as members of the Yurok Tribe, and the tribe intervened in the proceedings. (See § 224.4 [allowing tribes to intervene]; 25 U.S.C. § 1911(c) [same].)

---

[3] Undesignated statutory references are to the Welfare and Institutions Code.

## II.

### FIRST REUNIFICATION PERIOD

Following the disposition hearing, the Agency provided Mother resources for the services required by her case plan, including substance abuse programs, counseling services, and parenting programs. The Agency attempted to hold monthly compliance calls with Mother, often unsuccessfully. The Agency also communicated with a representative of the Yurok Tribe, who reported that the tribe would help Mother enroll in the tribe's substance abuse program, which included all other required services.

Mother enrolled in no services and, for months, did not respond to Agency attempts to speak with her. Shortly before the end of the first reunification period, the Agency was able to reach Mother, who claimed she had not received any resources for her case plan. She reported she was facing eviction from her tribal housing but was awaiting a hearing on the matter.

During this period, Mother spoke with J.M. by phone or video chat three to four times a month. J.M. reported that he enjoyed these calls but that Mother sometimes slurred her words and sounded drunk. G.T. refused to speak with Mother because Mother was "always drunk on the phone." Mother expressed a desire for an in-person visit with J.M. in Orange County and the Agency agreed to coordinate it, but Mother never made the trip.[4]

At a review hearing in August 2024, the juvenile court extended the parents' reunification services. The parties stipulated that the Agency had provided the family reasonable services.

---

[4] At one point, Mother said she was waiting on assistance from her tribe to make the trip, but it is unclear why she ultimately did not travel to Orange County.

4

## III.

### FINAL REUNIFICATION PERIOD

Soon after the juvenile court extended reunification services, the Agency provided Mother additional resources for parenting education, counseling, and substance abuse treatment.

During monthly compliance calls, Mother repeatedly reported she had not enrolled in services and said she should not have to because the children were wrongfully removed from her care and she was sober. For example, during one call, Mother said she should not have to complete any case-plan services because "the children were not removed from her care, but from the paternal grandmother's care." Mother added that the children were wrongfully removed and she would consult with her attorney. In yet another call, Mother reported she had not enrolled in a substance abuse treatment program because she was "getting sober . . . and d[id] not have the time to complete a program [n]or would be willing [to do so]." When the social worker encouraged her to enroll in a treatment program because she could utilize the program's drug testing, "[M]other became high-toned, stating, 'I told you before I don't need to drug test as I am sober.'"

When a tribal social worker arrived for an unscheduled visit with Mother to inform her about tribal services and assist with her impending eviction, Mother said she did not have time to speak. The social worker asked Mother to contact her, but Mother did not. The social worker tried to contact Mother again but was unsuccessful.

Mother informed the Agency in September 2024 that she had been evicted and was now "couch surfing" in Oregon. According to an Agency report, Mother "failed to inform [the Agency] of her challenges and barriers" so that it could assist her with obtaining housing.

5

The Agency provided Mother information on Oregon-based resources, including substance abuse treatment, a parenting class, and counseling. It could not locate a local substance abuse testing provider that would contract with the County of Orange, but asked Mother if she would be willing to pay for testing and receive reimbursement. Mother declined because her income was insufficient. The Agency also informed Mother that substance abuse treatment programs typically include counseling and testing. Mother did enroll in an online parenting class. But she continued to reject other services. She expressed willingness to participate in group counseling with G.T., if the child agreed, but G.T. refused.

Mother continued to call J.M. three to four times a month, sometimes sounding drunk. She had one call with G.T., in which Mother denied creating an unsafe home for the children and refused to apologize, leading to an argument.

IV.

PERMANENCY REVIEW HEARING

The juvenile court held a permanency review hearing under section 366.22 in January 2025. At the hearing, J.M. testified about his positive relationship with Mother, said he loved her, and expressed his desire to live with her.

Mother testified that she had been participating in services in Oregon and wanted to have J.M. placed with her. Mother claimed she was sober and never had a drug abuse problem. She asserted she never received referrals and denied telling the Agency she did not want to participate in services. Mother described completing a parenting class, attending church classes for sobriety, and being close to securing her own housing.

6

The assigned social worker testified about the Agency's efforts to provide services for Mother. She said she had consulted with the Yurok Tribe and provided resources consistent with the tribe's prevailing social and cultural conditions. According to the social worker, she had confirmed Mother's receipt of resources with Mother. Mother provided no proof of completion of any part of her case plan, not even the parenting class, nor had she requested assistance in enrolling in services.

After hearing argument, the juvenile court terminated reunification services and set the matter for a permanency planning hearing under section 366.26. The court found by clear and convincing evidence that the Agency had made active efforts to prevent the breakup of the Indian family for purposes of ICWA and related California law.[5] (§ 361.7, subd. (a); 25 U.S.C. § 1912(d).) It found Mother's claims that she had not received any resources not credible and observed that she had provided no documentation of enrollment in any program, aside from the parenting class. According to the court, the Agency "continually reached out" to Mother, in multiple locations, even as she refused to cooperate. And although there was difficulty finding a substance abuse testing facility in Oregon, the Agency provided outpatient programs, which included "testing components." Despite the Agency's efforts, Mother chose not to participate and her progress in the case plan had been minimal.

---

[5] The juvenile court denied the tribe's motion to "invalidate" the proceeding under ICWA on the basis that the Agency had not made the necessary active efforts. (25 U.S.C. § 1914.)

## DISCUSSION

Mother contends the Agency failed to make the required active efforts to reunify the family. We conclude that substantial evidence supported the trial court's finding that the Agency had met its obligations.

At the permanency review hearing, if an Indian child is not returned to the parents and the juvenile court finds that active efforts to reunify the family have not been made, the court must generally extend reunification services for another six months. (§ 366.22, subd. (b)(2)(A).) The Agency has the burden to show by clear and convincing evidence that it had made the required active efforts. (See *In re Michael G.* (1998) 63 Cal.App.4th 700, 712 [addressing standard of proof for active efforts under ICWA].)

"'Active efforts' means affirmative, active, thorough, and timely efforts intended primarily to . . . reunite an Indian child with their family." (§ 224.1, subd. (f).) They must "involve assisting the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." (§ 224.1, subd. (f).) Where appropriate, active efforts may include: "helping the parents overcome barriers, including actively assisting the parents in obtaining [appropriate] services"; "inviting [the] tribe to participate in providing support and services to the . . . family"; and "[m]onitoring progress and participation in services."[6] (§ 224.1, subd. (f)(2), (3), (9).) Overall, active efforts must be "'directed at remedying the basis for the parental termination proceeding.'" (*Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016, fn. 4.)

---

[6] This definition of "active efforts" under section 224.1, subdivision (f), is substantially identical to the term's definition under federal law. (See 25 C.F.R. § 23.2.)

The only published decision discussing the applicable standard of review held that an active-efforts finding is reviewed for substantial evidence.[7] (*C.F. v. Superior Court* (2014) 230 Cal.App.4th 227, 239.) Mother does not contend a different standard applies.

The record supports the juvenile court's finding that the Agency made the necessary active efforts. Throughout reunification, the Agency provided Mother resources for every aspect of her case plan, including substance abuse treatment, substance abuse testing, counseling, and parenting education.[8] (See § 224.1, subd. (f).) It monitored Mother's progress and participation in services, limited as they were. (See § 224.1, subd. (f)(9).) And it communicated with the tribe and invited it to participate in providing services. (See § 224.1, subd. (f)(3).)

Mother did not cooperate. With the exception of a parenting class, Mother repeatedly refused to engage in required services, claiming she should not have to. She refused to acknowledge ever having a drug-abuse problem and consistently claimed she was sober, without proof, even as her children reported otherwise. At various times, she did not respond to the Agency's efforts to reach her and turned away a tribal social worker who attempted to assist her. Mother's lack of progress in her case plan stemmed from her unwillingness to participate, rather than any failure by the Agency

---

[7] Other decisions simply applied either substantial evidence review or independent review without discussion. (E.g., *In re Michael G.* (1998) 63 Cal.App.4th 700, 715 [substantial evidence]; *In re K.B.* (2009) 173 Cal.App.4th 1275, 1286 [independent review].)

[8] As for a testing facility in Oregon that would contract with the county, the Agency referred her to substance abuse treatment programs in that state and informed her that those programs typically include testing. Mother never followed up.

9

to make active efforts. The Agency was not required to do more in the face of Mother's obstinance. (See *Letitia V., supra*, 81 Cal.App.4th at p. 1017 [parent's noncooperation affects scope of active-efforts obligation].)

Mother complains that during the final reunification period, the Agency did not assist her with housing, did not facilitate an in-person visit with J.M., and did not initiate group counseling for Mother and G.T. after Mother expressed willingness to participate.

None of these points is persuasive. As noted, a tribal social worker arrived at Mother's home to help with her looming eviction, but Mother turned her away, did not attempt to contact her, and did not respond to the social worker's additional attempts to reach her. The fact that Mother's tribe offered this assistance, rather than the Agency, is immaterial. (See *A.M. v. State* (Alaska 1997) 945 P.2d 296, 305 [for ICWA purposes, "[i]t is of no particular consequence that the Department of Corrections . . . , rather than [the social services agency], made these active remedial efforts"].) Indeed, the law anticipates that the tribe may provide services. (§ 224.1, subd. (f)(3).) Following her eviction, Mother "failed to inform [the Agency] of her challenges and barriers" so that the Agency could assist her with obtaining housing.

Moreover, the children were removed from Mother's care because of her substance abuse problems, not for any lack of housing. Absent any suggestion that the lack of housing prevented Mother from obtaining services for that core issue, even the Agency's failure to provide housing assistance would not preclude its satisfaction of the active-efforts obligation. (*Letitia V., supra*, 81 Cal.App.4th at p. 1016 (*Letitia V.*).)

As for an in-person visit with J.M., the Agency was willing to coordinate it—even though the juvenile court's visitation order provided only

for remote communications. And, again, J.M. was not removed from Mother's care based on the quality of their relationship. Indeed, the child testified that he had a good relationship with Mother, loved her, and wanted to live with her. Any failure to facilitate a visit would not have affected the Agency's active-efforts duty. (*Letitia V., supra*, 81 Cal.App.4th at p. 1016.)

Lastly, as for group counseling with G.T., Mother herself conditioned this service on G.T.'s willingness to participate, which the child declined.

Mother lists specific additional efforts the Agency could have made: e.g., it could have called substance abuse treatment facilities in Oregon to ask about drug testing, and it could have inquired with social workers in Oregon about available services or ask them to meet with Mother. But it will always be the case that the Agency could have done *something* more. The active-efforts obligation requires reasonably "thorough" efforts, not every conceivable action. (§ 224.1, subd. (f).) As discussed above, the Agency offered Mother suitable services for every area of her case plan. Given Mother's near-complete resistance to her case plan, we see no basis to find that the Agency was required to do more. (See *Letitia V., supra*, 81 Cal.App.4th at p. 1017.)

It was Mother's unfortunate recalcitrance, not any failure on the Agency's part, that led to the termination of Mother's reunification services. Substantial evidence supported the juvenile court's finding that the Agency had made the necessary active efforts.

11

## DISPOSITION

The petition for writ of mandate is denied.


SCOTT, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


MOTOIKE, J.